**FISHER DEVELOPMENT CO., a New Jersey Limited Partnership**

v.

**BOISE CASCADE CORPORATION; Chesapeake Industries, Inc.; Keystone Millwork Company; Reliance Universal Chemicals, jointly and severally and in the alternative.**

**BOISE CASCADE CORPORATION, Defendant/Third–Party Plaintiff**

v.

**PACIFIC WOOD PRODUCTS COMPANY, a/k/a Davidson P.W.P.; Plywood Panels, Inc., Third–Party Defendants.**

**Fisher Development Co., Appellant.**

**No. 93–5163.**

United States Court of Appeals, Third Circuit.

Argued Nov. 4, 1993.

Decided Sept. 21, 1994.

Abraham C. Reich (Argued), Stephanie Resnick, Samuel H. Israel, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, and Richard J. Jubanyik, Jubanyik, Varbalow, Tedesco, Shaw & Shaffer, Cherry Hill, NJ, for appellant Fisher Development Co.

George J. Miller, Dechert, Price & Rhoads, Philadelphia, PA, Bruce W. Clark (Argued) Dechert, Price & Rhoads, Princeton, NJ, for appellee Boise Cascade Corp.

BEFORE: SLOVITER, Chief Judge, and STAPLETON, Circuit Judge, and RESTANI,* Judge, United States Court of International Trade.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Fisher Development Company ("Fisher") sued Boise Cascade Corp. ("Boise") to recover response costs it incurred in voluntarily remediating a hazardous waste site it owned. Fisher claimed that Boise, the sublessee of the site from 1974 to 1977, was a responsible party pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERC-LA"), 42 U.S.C. § 9607(a). In granting Boise's motion for summary judgment, the district court found that a release, previously executed in favor of Boise in connection with the settlement of a landlord-tenant dispute,

---

* Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

extinguished all claims against it, including any claim for environmental clean-up costs. Fisher appeals. We will affirm.

## I.

Fisher owned property located at 875 Sherman Avenue, Pennsauken, New Jersey ("the premises"). Fisher agreed to lease the premises to Chesapeake Industries, Inc. ("Chesapeake") from March 1, 1967, to February 28, 1982. Fisher soon assigned its interest in the lease to Route 73 Industrial Development Corporation ("Route 73"), whose vice president, Daniel Fisher, was also a general partner of Fisher. In February, 1980, Route 73 reassigned its interest in the lease back to Fisher.

Keystone Millwork Company ("Keystone"), a subsidiary of Chesapeake, produced plywood panels and doors at the premises from 1967 until 1973 or early 1974. At that point, Chesapeake assigned the lease to Boise, which agreed to assume all liabilities of Chesapeake under its lease with Fisher. Boise manufactured plywood panels on the premises from April 1974 until August 1976. In September 1977, Boise, with Route 73's consent, entered into a sub-sublease with Winner Sales and Services Company, Inc. ("Winner Sales"), which thereafter used the premises as a warehouse.

While Winner Sales was occupying the premises, Boise and Route 73 had a disagreement regarding responsibility for repairs and maintenance at the premises. Boise sued Route 73 in the Superior Court of New Jersey, Chancery Division, in October 1978 to enforce covenants in the original lease between Fisher and Chesapeake. Subsequently, Winner Sales filed for bankruptcy protection, thereby making the controversy between Boise and Route 73 the subject of an adversary proceeding in the United States Bankruptcy Court for the District of New Jersey.

Boise, Route 73, and Fisher ultimately entered into an agreement settling the suit. Part of this agreement called for the parties to exchange reciprocal releases. The release in favor of Boise, which was executed on April 16, 1981, was prepared on a pre-printed form labeled "N.J. Release, General" and consisted of two parts. The first part, which included the pre-printed terms, provided that Route 73 and Fisher:

[R]emised, released and forever discharged, and by these Presents do [ ] remise, release, and forever discharge [Boise] of and from all debts, obligations, reckonings, promises, covenants, agreements, contracts, endorsements, bonds, specialties, controversies, suits, actions, causes of actions, trespasses, variances, judgments, extents, executions, damages, claims or demands, in law or in equity, which against [Boise], [Route 73 or Fisher] ever had, now has or hereafter can, shall, or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day and date of these Presents.

The parties then typed in additional language following the pre-printed phrase "[m]ore particularly." This language provided for the release of:

[A]ny and all claims arising from or related to certain suits now pending in the Superior Court in New Jersey, Chancery Division, Camden County, Docket No. C–660–78 in which Boise Cascade Corporation is the plaintiff and Route 73 Industrial Development Corporation is the defendant; and, in the United States District Court for the District of New Jersey, Bankruptcy No. 80–03165, Adversary Nos. 80–0270 and 0271.

Together with any and all claims arising out of or related to a certain Lease Agreement pursuant to which Boise Cascade Corporation sublets certain premises known as 875 Sherman Avenue, Pennsauken, New Jersey, Route 73 Industrial Development Corporation being the successor to Fisher Development Co., original lessor of the subject premises, together with any subsequent Lease Agreements, Modifications or Amendments thereto; and/or any claims arising from or related to Boise Cascade Corporation's occupation of the subject premises, or any tenant or party occupying the subject premises under Boise Cascade Corporation.

Boise paid Fisher $2,000.00 as a part of the settlement agreement.

According to Fisher, in 1989, eight years after the execution of the releases, it discovered that a cistern on the premises contained volatile organic compounds, which were migrating into the surrounding subsoils and the groundwater. Fisher voluntarily remediated the hazardous substances at the premises at a cost exceeding $860,000.00. An investigation by Fisher traced the pollution to Boise, Chesapeake, and Keystone.

Fisher initiated this action against Boise, Chesapeake, and Keystone under § 107(a) of CERCLA, seeking to recover costs associated with cleaning up the cistern. Fisher also included a New Jersey common law negligence claim. Boise filed a motion for summary judgment, asserting that all claims against it were extinguished by the release it had obtained from Fisher. The district court granted Boise's motion, holding that the release barred Fisher's claims. The district court then entered an order under Fed. R.Civ.P. 54(b), stating that there was no just reason for delay, and directing that its order granting summary judgment in favor of defendant Boise be deemed a final judgment as to all claims and parties. Fisher appealed.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b). Our jurisdiction over this appeal rests on 28 U.S.C. § 1291. We exercise plenary review over the district court's grant of Boise's motion for summary judgment. *Public Interest Research of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 76 (3d Cir. 1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). The district court's decision to grant Boise's motion was proper only if "there [was] no genuine issue as to any material fact and ... [Boise was] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Moreover, all inferences and facts must be viewed in a light most favorable to Fisher as the non-moving party. *Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 202–03 (3d Cir.1987), *cert. denied*, 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

## II.

Fisher seeks to recover from Boise the response costs that it incurred in connection with the cistern. Fisher's claim is based on § 107(a) of CERCLA, which authorizes both governmental and private entities to sue statutorily defined responsible parties to recover costs incurred in cleaning up hazardous waste disposal sites. Fisher correctly points out that Boise is a responsible person under § 107(a)(2), which imposes liability on "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Boise insists, however, that Fisher has released it from this liability, pointing to the general release it received at the time of the settlement agreement and to § 107(e)(1) of CERCLA, which Boise reads as expressly authorizing agreements between private parties to allocate the risk of CERCLA liability between themselves. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

Six courts of appeals, including our own, have been called upon to interpret the seemingly inconsistent text of § 107(e)(1). They have uniformly reconciled the first and second sentences by holding that responsible parties cannot contract away their liability under CERCLA for cleaning up a release, but that they may allocate the ultimate financial burden of that clean-up by agreements among themselves. *Beazer East Inc. v. The Mead Corporation*, 34 F.3d 206 (3d Cir.1994); *Olin Corp. v. Consolidated Aluminum Corp.*, 5 F.3d 10, 14 (2d Cir.1993) ("private parties may contract with respect to indemnification and contribution" but "all responsible parties remain fully liable to the government"); *John S. Boyd Co., Inc. v. Boston Gas Co.*, 992

F.2d 401, 405 (1st Cir.1993) ("a party cannot escape liability by means of a contract with another party" but parties "can allocate responsibility among themselves by contract"); *United States v. Hardage*, 985 F.2d 1427, 1433 (10th Cir.1993) ("although responsible parties may not altogether *transfer* their CERCLA liability, they have the right to obtain indemnification for that liability") *AM Int'l, Inc. v. International Forging Equipment Corp.*, 982 F.2d 989, 993–95 (6th Cir. 1993) ("a release can be effective to allocate among responsible parties the financial burden of CERCLA cleanup liability"); *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1461 (9th Cir.1986) (enforcing release of CERCLA liability).

Fisher does not contend that risk allocation agreements between responsible parties are impermissible under CERCLA. It does maintain that, for a number of reasons, the release it signed was ineffective to relieve Boise of liability on Fisher's § 107(a) claim. Before turning to Fisher's arguments concerning the release it gave Boise, we will examine the literal scope of that release and resolve a threshold choice-of-law issue.

The releases that Fisher and Boise exchanged at the time of their settlement were general releases of the kind regularly utilized in New Jersey. *See, e.g.,* Joseph Pierce Lodge, *New Jersey Practice: Legal Business Forms*, § 3642; C. Zachary Seltzer, *New Jersey Law with Forms*, 4–479. On its face, the release that Fisher executed was not limited to specifically described claims. Its language evidences an intent on the part of Fisher to release all claims based on events occurring from "the beginning of the world" to the date of the execution of the release. The language includes not only all such claims that Fisher "ever had" or "now has," but also any such claim that it "hereafter can, shall, or may have." Given the limitation to claims based on events occurring before the date of the release, we can only take the phrase "hereafter may have" to mean that the parties wished to release not only those claims of which they were currently aware, but also those they might subsequently discover based on their relationship prior to the execution of the release.

To read the language following the phrase "more particularly" as establishing the outer perimeters of the release, as Fisher suggests we do, would require us to disregard the entire first paragraph of the release and attribute no significance whatever to the fact that the parties chose to execute general releases. Moreover, even under Fisher's suggested approach, the language chosen, on its face, releases "any claims arising from or related to Boise Cascade Corporation's occupation of" 875 Sherman Avenue.

It thus seems clear to us that the claim Fisher now seeks to assert against Boise comes within the literal scope of Fisher's release. Accordingly, Fisher can prevail only if it can point to a reason its release should not be enforced as written. Fisher maintains there are five such reasons: (1) extrinsic evidence demonstrates that the parties intended to release only the claims that were being settled and not environmental claims; (2) a release is not effective to release liability under CERCLA unless specific reference is made to that liability; (3) the release was obtained by fraud; (4) the parties to the settlement agreement were acting under a mutual mistake of fact; and (5) enforcement of the release would violate public policy.

■ Before addressing the sufficiency of each of these reasons in turn, we must first ascertain what law is applicable to the issues raised by Fisher's contentions. It is, of course, well settled that federal law governs issues relating to the validity of a release of a federal cause of action. *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952). Giving content to that federal law, however, can be accomplished in two different ways: courts can look to state law and incorporate it into the federal law, or they can fashion federal common law. Where Congress has made the choice between the two, its decision governs. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Where, as here, no congressional intent is reflected in the statute or its legislative history, courts must make the choice between incorporating state law or fashioning federal common law after considering

three factors: (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and, (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 728–29, 99 S.Ct. at 1458–59.

Five courts of appeals, including our own, have addressed this issue. All have chosen to apply state rules of release and contract law. *Beazer East Inc. v. The Mead Corporation,* 34 F.3d 206 (3d Cir.1994); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 14–15 (2d Cir.1993); *John S. Boyd Co., Inc. v. Boston Gas Co.,* 992 F.2d 401, 406 (1st Cir.1993); *United States v. Hardage,* 985 F.2d 1427, 1433 n. 2 (10th Cir.1993); *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457–60 (9th Cir.1986). Each court has perceived no imperative for a nationally uniform law of CERCLA releases. While recognizing that there may be an occasional state rule that will conflict with the objectives of CERCLA and should not be applied, each has found no conflict between those objectives and making state contract and release law the generally applicable rules. Finally, each of the courts to examine the issue has concluded that the application of federal rules could be expected to seriously disrupt commercial relationships.

We will thus apply New Jersey release and contract law unless we are persuaded that the application of a particular rule relied upon by one of the parties would conflict with CERCLA or the attainment of its objectives.

### III.

■ Fisher insists that the release is ambiguous in the context of its CERCLA claim and, accordingly, that extrinsic evidence is admissible to clarify its meaning in this context. The release is ambiguous, according to Fisher, because it fails to refer to "future unknown liabilities" and because the phrase "more particularly" is inconsistent with the broader language of the release. The extrinsic evidence it urges us to consider consists of: (1) letters sent from Boise to Fisher, the most significant of which said: "Boise will pay your client the sum of $2,000.00 in full settlement of any and all claims relating to the above matter [i.e. the landlord/tenant dispute];" (2) the fact that the release was signed in settlement of a landlord/tenant dispute, with no mention of environmental liabilities at the time of signing; and, (3) the fact that Boise paid only $2,000 in cash in connection with the settlement.

As we have earlier indicated, we find no ambiguity in the release as applied to the situation before us. While it does not use the words "future unknown liability," future unknown liabilities based on events occurring before the release are clearly covered. We do not read the "more particularly" clause as eliminating the preceding paragraph and, even if we did, the intent to release all claims arising from Boise's occupation of the premises is clear. Accordingly, we decline to consider extrinsic evidence which is allegedly in conflict with the express terms of the release. *See, Filmlife, Inc. v. Mal "Z" Ena, Inc.,* 251 N.J.Super. 570, 598 A.2d 1234, 1235 (App. Div.1991).

Moreover, even if we were permitted to consider extrinsic evidence, the evidence tendered by Fisher would not alter our conclusion regarding the scope of the release. That evidence tends only to establish the undisputed proposition that the parties intended to settle the claims then in litigation; it lacks probative value on the issue of whether the parties also intended to settle all potential claims against each other by exchanging reciprocal, general releases.

### IV.

Fisher urges us to hold that a party may not release a CERCLA claim without executing a document that makes specific reference to CERCLA liability. A necessary corollary of such a holding would be that a general release, no matter how clearly it evidences an intent to wipe the slate clean between the parties, cannot release a CERCLA-based claim.

■ In *First Jersey Nat'l Bank v. Dome Petroleum Ltd.,* 723 F.2d 335 (3d Cir.1983), while reviewing New Jersey law on risk allocation agreements, we observed:

Under a clear line of contemporary New Jersey cases, parties to a commercial transaction have great latitude in their preferred allocation of risks of loss.... Furthermore, under New Jersey law a broadly worded indemnification clause need not also recite the specific sorts of loss within its coverage.

*Id.* at 339–40 (citations omitted). Our review of the New Jersey case law subsequent to *First Jersey* reveals nothing contrary to our observation there, and we find nothing suggesting that New Jersey courts decline to enforce general releases as applied to particular types of claims. Apparently, Fisher also has failed to find New Jersey authority for the proposition that it urges.

■ Under these circumstances, Fisher's argument must be that we should find in CERCLA an implied limitation on the authority conferred in § 107(e)(1) for private risk allocation and that any state law rule inconsistent with that implied limitation should be disregarded. Fisher is not precise about what it is in CERCLA that supports such a limitation. We infer, however, that Fisher believes CERCLA's statutory scheme requires special protection against inadvertent waivers of CERCLA claims. We find no such implicit mandate in CERCLA. To the contrary, we find in § 107(e)(1) a policy favoring private ordering of ultimate risk distribution and we believe that policy counsels in favor of courts enforcing the intention of the parties as evidenced by the terms of a release. Given the context in which this kind of risk allocation agreement is negotiated and the character of the parties to those agreements, we believe Fisher's rule would lead to more incidents of frustration of the parties' intent than a rule requiring enforcement of clear general releases in accordance with their terms. That is, we believe that most parties who execute general releases in a commercial context intend to wipe the slate clean and that Fisher's rule of law would create a trap for the unwary. In short, while there will be some instances in which CERCLA claims are inadvertently released if general releases are enforced as written, we think there would be far more instances, if Fisher's rule were adopted, in which parties inadvertently *fail to release* their CERCLA claims when they intend to do so.[1]

1. A number of courts have applied the law of states other than New Jersey and come to the conclusion that broad release provisions include CERCLA liability, even when that liability is not specifically mentioned. In *Beazer East Inc. v. The Mead Corporation,* 34 F.3d 206 (3d Cir.1994) this court applied Alabama law in the context of an agreement to indemnify against certain environmental liabilities. We agreed with the legal standard applied by the district court: ... "pre-CERCLA [indemnification] agreements may cover CERCLA liability if such agreements are *'worded broadly enough to encompass any and all liabilities,* or if environmental liability is clearly referred to in the agreement.' " *Id.* at 212 (emphasis added). While we ultimately declined to order indemnification, we did so because the indemnification clause did not encompass "any and all liabilities" and was ambiguous as applied to the circumstances of the case.

The Court of Appeals for the First Circuit, applying Massachusetts law, recently held that, "[t]o transfer CERCLA liability, the agreement must contain language broad enough to allow us to say that the parties intended to transfer either contingent environmental liability, or all liability." *John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 406–07 (1st Cir.1993). Applying Oklahoma law, the Court of Appeals for the Tenth Circuit found that, "[a]lthough an indemnification agreement must clearly and unequivocally express an intent to exculpate the indemnitee for

its own acts, it need not specifically refer to those acts in order to achieve that result. Rather, such an intent may be found where the language of the indemnification is so broad and all-inclusive that it necessarily sweeps all events—including those occurring because of the indemnitee's actions—into its coverage." *United States v. Hardage,* 985 F.2d 1427, 1434–35 (10th Cir.1993) (citation omitted). The Court of Appeals for the Ninth Circuit, applying New York law, held that a broad but unspecific release included CERCLA liabilities and therefore barred extrinsic evidence of intent to the contrary. *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1462 (9th Cir.1986). As a final example, in *Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124 (W.D.N.Y. 1991), the court, applying New York law, stated that:

The case law on this subject, though not completely uniform, indicates that a settlement agreement which shows that the parties intended to resolve all their disputes involving any type of claim includes CERCLA claims, even if the agreement is framed in general terms and does not specifically refer to CERCLA or to environmental liability. However, if the agreement appears to be limited to specific disputes or particular types of liability, CERCLA liability will be excluded unless the agreement contains a clear, unambiguous reference to such liability.

## V.

■ Fisher next urges that the release is unenforceable because Boise knew of the condition of the cistern prior to the exchange of releases and failed to inform Fisher of that condition. Fisher does not maintain that Boise misrepresented the condition of the cistern or took affirmative steps to conceal its condition from Fisher. Fisher's claim is rather that Boise had a duty to disclose and remained silent in breach of that duty. Boise denies that it had greater knowledge of the condition of the cistern than Fisher.

Under New Jersey law, there are only three categories of relationships that give rise to an affirmative duty to disclose. The first category "includes definite fiduciary relationships, such as principal and agent." *Berman v. Gurwicz*, 189 N.J.Super. 89, 458 A.2d 1311, 1313 (Ch.Div.1981), *aff'd*, 189 N.J.Super. 49, 458 A.2d 1289 (App.Div.1983), *certification denied*, 94 N.J. 549, 468 A.2d 197 (1983). The second class:

> [E]mbraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, *expressly* reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is *necessarily* implied. The nature of the transaction is not the test in this class.

*Id.* 458 A.2d at 1313–14 (emphasis in original). Finally:

> The third class includes those instances where there is no existing fiduciary relationship between the parties, and no special confidence reposed is expressed by their words or implied from their acts, but

the very contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties. The contract of insurance is a familiar example.

*Id.* at 1314.

The relationship between a landlord and tenant is not a "definite fiduciary relationship" and Boise and Fisher dealt at arm's length. Nothing in the record suggests that they expressly, or impliedly by their conduct, reposed trust and confidence in one another. Nor is there anything about the transaction between them or the circumstance under which it was negotiated that "necessarily calls for perfect good faith and full disclosure." Like the district court, we perceive no rationale under which we think the Supreme Court of New Jersey might impose an affirmative disclosure duty on Boise under the circumstances of this case. In this regard, we think it significant that, at the time of the settlement agreement, Fisher, and only Fisher, had access to the property. Boise was no longer a tenant and had not been one for four years.

## VI.

■ Alternatively, Fisher argues that the case should be remanded and the district court be required to determine whether Fisher and Boise, when they exchanged their releases, were laboring under a mutual mistake of fact. "A mutual mistake occurs when both parties are under substantially the same erroneous belief as to the facts." 2 E. Allen Farnsworth, *Farnsworth on Contracts*, § 9.3. Under New Jersey law:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was

---

*Id.* at 131 (citations omitted). Therefore, because the indemnity agreement signed by the parties was broad, the court held that it included CERCLA liabilities, even though it did not expressly refer to environmental claims.

Fisher attempts to distinguish these cases on the grounds that in each of them the releasor, unlike Fisher, either had prior knowledge of the hazardous waste problem or had caused or con-

tributed to the problem itself. Even if this assertion is true, it does limit the applicability of the holdings in the above cases to the case at bar. In those cases, the courts all stated that the basis for their holding was the breadth of the release provision rather than the releasor's knowledge or contributory actions. The release executed in favor of Boise is similarly broad.

made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party. A compromise which is the result of a mutual mistake is not binding and consent to a settlement agreement is not considered freely given when it is obtained as the result of a mistake.

*Lampley v. Davis Mach. Corp.*, 219 N.J.Super. 540, 530 A.2d 1254, 1259–60 (App.Div. 1987) (citations omitted).

Fisher has failed to raise a genuine issue of material fact regarding its claim of mutual mistake. In response to Boise's motion for summary judgment, Fisher tendered no evidence tending to show that it or Boise entered their settlement agreement and exchanged their general releases based on an affirmative understanding that there were no environmental problems on the premises. Indeed, Fisher insists in connection with its fraud argument that Boise was fully aware that there was a problem. Moreover, we know that when the parties exchanged their releases they did so premised on an understanding inconsistent with the alleged affirmative understanding that there were no problems on the premises. The parties exchanged general, rather than limited, releases because they understood that all facts concerning the leasehold and their prior relationship were not necessarily known and that currently unknown facts could later give rise to liabilities. Thus, the possibility of problems on the premises was a basic assumption of the parties when they decided to wipe the slate clean between themselves.

## VII.

■ Finally, Fisher makes a two-pronged public policy argument against enforcement of the release. First, Fisher contends that it would be bad public policy to allow a release obtained for $2,000 to extinguish over $860,-000 in CERCLA liability. We find this contention both factually and legally flawed. This is not a case in which a party paid $2,000 for a release. This is a case in which two parties that had terminated a commer-

cial relationship decided they wished to walk away, without leaving any loose ends. In order to accomplish this, one paid the other $2,000 and they executed reciprocal, general releases. The consideration for Fisher's release thus was not simply a $2,000 payment.

More importantly, where, as here, parties may legally allocate risks between themselves, courts, in the absence of special circumstances, do not as a prerequisite to enforcement retroactively assess whether the original bargain was fair. Moreover, even if we were willing to undertake such an assessment, we could not appropriately do so simply by comparing the financial burden of a realized loss with the original consideration for the risk allocation agreement. Employing such an approach would frequently result in insurance policies not being enforced because the amount of covered loss far exceeded the premiums paid.

■ Second, Fisher urges that extinguishing Boise's liability based on the release would run counter to CERCLA's goal of encouraging voluntary cleanup efforts.[2] Specifically, Fisher argues that, if releases of CERCLA liability are enforceable, an entity that has granted a responsible party a release from liability will be better off waiting for the government to initiate cleanup procedures rather than initiating them itself. If the entity initiates remedial action, it will be foreclosed by its release from recovering from the released party its proportionate share. If the government proceeds first and incurs the expense of that action, it can recover those expenses from the released party, thereby decreasing the releasor's share of the costs. *See* CERCLA §§ 107(a) and 113(f)(1).

Because the effect of a release is solely to shield the recipient from liability rather than to shift its liability to another (as in the case with an agreement to indemnify, for example), it is true that a releasor of CERCLA liability will normally have a disincentive to initiate remedial action. It is Congress, however, that makes the public policy which is

---

**2.** This goal is evidenced by the fact that CERCLA provides a private right of action and a right of contribution from other responsible parties to persons that incur response costs themselves. *See* CERCLA §§ 107(a) & 113(f)(1), 42 U.S.C. § 9613(f)(1) (1988).

relevant here, and Congress has established that policy in § 107(e) of CERCLA. As we have indicated, Congress there authorized private risk allocation. Moreover, this authorization was clearly intended to include both risk-shielding as well as risk-shifting agreements. While releases are not specifically mentioned, hold-harmless agreements, a traditional form of risk-shielding agreement, are expressly included.[3]

## VIII.

The judgment of the district court will be affirmed.

---

**3.** In a hold-harmless agreement, one party agrees "to hold the other without responsibility for ... liability arising out of the transaction involved." *Black's Law Dictionary* 731 (6th Ed. 1990). *See* Thaddeus Bereday, Note, *Contractual* *Transfers of Liability Under CERCLA Section 107(E)(1): For Enforcement of Private Risk Allocation in Real Property Transactions,* 43 Case W.Res.L.Rev. 161 (1992) (text associated with footnotes 7, 9, 149–63).