2008 VT 96

## Northern Security Insurance Company v. Mitec Electronics, Ltd., Mitec Telecom, Inc. and Myer T. Bentob

[965 A.2d 447]

No. 07-109

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 1, 2008

*Bruce C. Palmer* of *Downs Rachlin Martin PLLC*, St. Johnsbury, for Plaintiff-Appellee.

*Samuel Hoar, Jr.* and *Douglas D. Le Brun* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendants-Appellants.

¶ 1. **Reiber, C.J.** Defendants Mitec Electronics Limited, Mitec Telecom Incorporated, and Myer T. Bentob appeal from a series of adverse superior court orders in a declaratory-judgment action concerning insurance coverage filed by plaintiff Northern Security Insurance Company (NSIC). Defendants' claims of error fall into three general categories: (1) jurisdictional; (2) the interpretation of a general release; and (3) plaintiff's post-judgment motion seeking to amend its complaint to request recoupment of attorney's fees. We affirm in part and reverse in part.

¶ 2. The facts underlying this appeal extend nearly three decades into the past. From 1979 until 1985, Mitec Systems, a Vermont corporation, leased property in the Alling Industrial Park in Williston, Vermont. Mitec Systems allegedly polluted this property, and the groundwater underneath it, with industrial chemicals used in its manufacturing processes. The State and other parties sued "Mitec Systems Corp. d/b/a Mitec Electronics, Ltd." in 1984 for damages, cleanup costs, and other relief. Mitec Systems sought coverage for those claims under an insurance policy issued by NSIC to Mitec Systems and Mitec Manufacturing Company, Ltd., a Canadian corporation, ATIMA.

¶ 3. In 1988, after the 1984 claims were resolved, Mitec Systems brought an action against NSIC to recover certain unreimbursed costs of defense and cleanup. That coverage action settled in 1989. The 1989 General Release executed in connection with that settlement recites that, in exchange for $16,250, "Mitec Systems Corporation," by its President and majority shareholder Myer Bentob, broadly "remise[d], release[d] and forever discharge[d]" NSIC

> from all, and all manner of action and actions, cause and causes of action, . . . claims and demands whatsoever, in law or in equity, which against the said [NSIC] ever had, now has or which its successors, affiliates or assigns hereafter can, shall or may have.

Later in 1989, the Vermont Secretary of State dissolved Mitec Systems for failing to file annual reports.

¶ 4. Some nine years later, in 1997, Gerald and Nancy Bates, who live near the Williston industrial park, sent a letter to Mitec Telecom, a Canadian corporation formed in 1996 as a result of the amalgamation of Mitec Electronics and another Canadian corporation, asserting pollution-related claims against Mitec Systems,

Mitec Electronics, and Mitec Telecom. The letter warned Mitec Telecom to expect a settlement demand from the Bates's counsel, and noted that the State of Vermont was still investigating previously unexplored federal remedies relating to the earlier pollution. In June 1997, Mitec Telecom informed NSIC about the letter and demanded coverage under the same policy that provided coverage against the 1984 lawsuit, asserting that it had acquired Mitec Systems' rights to coverage under the NSIC-issued CGL policy, but not stating how or why. See *N. Sec. Ins. Co. v. Mitec Telecom, Inc.*, 38 F. Supp. 2d 345, 346 n.1 (D. Vt. 1999). NSIC notified Mitec Telecom in November 1997 that it would not provide coverage under the policy, and simultaneously brought an action in Washington Superior Court seeking a declaration that it had no duty to defend Mitec Telecom. *Id.* at 346. The suit was removed to federal court, and Judge Sessions concluded that the demand letter did not constitute a "suit" and was therefore insufficient to trigger NSIC's duty to defend. *Id.* at 349.

¶ 5. In 1999, the Bates plaintiffs filed suit in superior court, seeking damages and other relief arising from Mitec Systems' pre-1989 pollution in the Williston industrial park. The suit named Mitec Systems, Mitec Electronics, the Beatrice Alling Trust, and Beatrice Alling as defendants. Myer Bentob was not a named defendant. NSIC agreed to defend all three Mitec companies in the Bates suit, subject to a September 1999 bilateral nonwaiver agreement, which provided as follows:

> Should [NSIC] establish a lack of defense coverage of any party by judgment of a court of competent jurisdiction, it may withdraw from the defense of that party on 30 days written notice of its intent to withdraw. In such event, [NSIC] reserves its right to argue and seek an order from a court that it may recoup from Mitec its costs of defending that party. Mitec expressly denies that [NSIC] would have any such right to recoupment and by executing this Agreement does not waive its right to make this assertion in any proceeding.

The nonwaiver agreement purported to bind, on the one hand, "Mitec Electronics, Ltd. (through the authorized agent of a majority of its former shareholders), Mitec Systems Corporation (through the authorized agent of its former shareholders), and

Mitec Telecom, Inc. (through its duly authorized agent), collectively called 'Mitec' " and, on the other hand, NSIC. The agreement was signed by Myer Bentob on behalf of each of the three named Mitec companies, and by NSIC's general counsel.

¶ 6. In October 1999, NSIC filed this complaint for declaratory relief in the Washington Superior Court, naming Mitec Electronics, Mitec Systems, Mitec Telecom, and Myer Bentob as defendants. NSIC sought a judgment declaring that it was under no obligation to provide coverage for Myer Bentob, Mitec Systems, Mitec Electronics, or Mitec Telecom. Beginning with a jurisdictional order dated August 25, 2003, and in a succession of decisions thereafter, the superior court concluded that it had jurisdiction over all of the named defendants and that no coverage was available to any of them because of the 1989 general release.

¶ 7. The August 25, 2003 order, a declaratory judgment order dated April 13, 2004, and a judgment dated July 1, 2004, give rise to several claims in the instant appeal, concerning the court's jurisdiction and the scope and effect of the general release. First, defendants argue that NSIC failed to state a claim for which relief can be granted against Myer Bentob, who was not a defendant in the Bates lawsuit. See V.R.C.P. 12(b)(6). The Mitec defendants also contend that the superior court lacked jurisdiction over Mitec Telecom and Mitec Electronics because neither company had purposefully availed itself of the privilege of conducting activities in Vermont. See *Hanson v. Denckla*, 357 U.S. 235, 253 (1958).

¶ 8. Defendants raise two claims about the general release: (1) it did not bind any entity but Mitec Systems; and (2) it did not extend to future or unknown claims. The first claim rests on defendants' assertions that Mitec Telecom was not a successor, affiliate, or assign of Mitec Systems and that, at a minimum, the term "affiliate" is ambiguous in the context of the release and should therefore be construed against NSIC. As to the second claim, defendants argue that a general release does not bar future claims unless it contains explicit language doing so, and that there was no such language in this release.

¶ 9. The remainder of defendants' claims arise from the superior court's actions after the declaratory judgment in favor of NSIC was entered on July 1, 2004. In it, the superior court ruled that the general release between Mitec Systems and NSIC

bars any and all coverage for defense or indemnity of past or future claims, whether known or unknown, arising out of the Alling Industrial Park ('AIP') Site concerning pre-1989 operations and contamination at the AIP, including the [Bates lawsuit].

The judgment further declared that the general release binds Mitec Electronics and Mitec Manufacturing, "both of which are 'affiliates' of Mitec Systems Corp" and "Mitec Telecom, Inc., as a purported or potential successor-in-liability or affiliated company to the other Mitec companies."[1] Further facts pertinent to the post-judgment claims of error are adduced below.

¶ 10. We consider the jurisdictional claims first, then turn to the effect of the general release, and finally to the claims arising from the post-judgment amendment.

## I. Myer Bentob

¶ 11. Appellants argue that no claim for which relief can be granted was asserted against Myer Bentob, and that the superior court accordingly did not have jurisdiction to adjudicate the question of whether he had coverage. We agree.

¶ 12. In this action, NSIC sought a declaration that "neither the Policy nor any other policy of insurance it has issued provides coverage . . . for the liabilities asserted" in the Bates lawsuit. As noted above, Mr. Bentob was not named in the Bates lawsuit and, naturally enough, did not seek coverage for liabilities arising out of it. As to Mr. Bentob, the declaration requested would have been that he was not entitled to something he had never sought, and which he had no reason to seek. Whether he was entitled to such a declaration is just the sort of "abstract question or hypothetical threat [that] is not a sufficient basis for a declaratory judgment." *Williams v. State*, 156 Vt. 42, 60, 589 A.2d 840, 851 (1990). Mr. Bentob should have been dismissed from the action. V.R.C.P. 12(b)(6).[2]

---

[1] The court also concluded that the release bound Myer Bentob. In light of our conclusion that the court lacked jurisdiction over Mr. Bentob, we do not consider defendants' claim that the court erred in concluding that the release applied to him.

[2] In light of this conclusion, we have no occasion to consider defendants' arguments concerning Mr. Bentob's asserted lack of minimum contacts with Vermont. Nor do

## II. Personal Jurisdiction: Mitec Telecom and Mitec Electronics

¶ 13. Mitec Telecom and Mitec Electronics also moved to dismiss based on Rule 12(b)(2) of the Vermont Rules of Civil Procedure. The superior court denied the motion, noting that "Mitec's request to [NSIC] to defend the underlying [Bates] action was made in Vermont. The tort alleged in the underlying case was committed in Vermont, and the underlying *Bates* lawsuit is pending in Vermont." The court concluded that "no matter what the corporate viability of any Mitec entity, once it requests defense and coverage in Vermont, it is engaging in business here. Defendants cannot claim coverage and simultaneously disclaim the carrier's ability to adjudicate coverage responsibility." We review the superior court's decision on the motion to dismiss de novo. *Godino v. Cleanthes*, 163 Vt. 237, 239, 656 A.2d 991, 992-93 (1995).

¶ 14. Vermont's long-arm statute, 12 V.S.A. § 855, confers jurisdiction to the full extent allowed by the United States Constitution. *Brown v. Cal Dykstra Equip. Co.*, 169 Vt. 636, 636, 740 A.2d 793, 794 (1999) (mem.). Our inquiry focuses on whether the defendant has sufficient contacts with Vermont that maintaining the lawsuit here does not "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). The central question in determining whether specific jurisdiction may be exercised is whether the defendant has purposefully availed itself of the privilege of acting in the forum state. This requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Put another way, the purposeful-availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted).

¶ 15. Personal jurisdiction must be proved independently as to each defendant. *Schwartz v. Frankenhoff*, 169 Vt. 287, 294,

we consider the impact on Mr. Bentob of any of the remaining contentions on appeal.

733 A.2d 74, 80 (1999). "[W]here no evidentiary hearing is held on the jurisdictional issue, 'the Court must consider the pleadings and affidavits in a light most favorable to the plaintiff.' " *Genesis Ins. Co. v. Alfi*, 425 F. Supp. 2d 876, 879 (S.D. Ohio 2006) (citation omitted). NSIC was required to "make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction." *Godino*, 163 Vt. at 239, 656 A.2d at 992.

¶ 16. Mitec Telecom and Mitec Electronics assert that the superior court had before it "*no* competent 'evidence of specific facts' or 'affirmative proof' as to Telecom's [or] Electronics' . . . contacts with Vermont." The Mitec defendants take particular issue with the court's purported reliance on opposing counsel's own statements as "virtually the exclusive source for the 'facts' on which the court relied in reaching its decision." Accordingly, defendants characterize the court's jurisdictional conclusions as "ludicrous" and "inane." There is no error, and the tenor of appellants' protestations does not create error where none exists.[3]

¶ 17. The genesis of this controversy was the demand to NSIC by Mitec Telecom and Mitec Electronics for insurance coverage in the Bates Vermont lawsuit. The *only* theory under which that coverage is available is that Mitec Telecom and Mitec Electronics are assignees, successors, or affiliates of either Mitec Manufacturing or Mitec Systems, which were the named insureds in the NSIC policy.[4] Defendants now assert that Mitec Telecom "bore no relationship with [Mitec] Systems," but this assertion is belied by

---

[3] Defendants' briefs before this Court lack the professional tone we expect from members of the bar. The derisive references to the trial court's "hyperbole" and "erudition," and to the court's decision as "ludicrous," "inane," "risibl[e]," and "disingenuous" distract from the arguments on the merits in this case and do not advance the quality of justice in Vermont. "A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. . . . A lawyer should demonstrate respect for the legal system and those who serve it, including judges, other lawyers and public officials." Preamble: A Lawyer's Responsibilities, Vermont Rules of Professional Conduct.

[4] Mitec Telecom has been reticent, in this case and in the federal suit in which it claimed coverage under the same policy, to declare precisely *how* it came to benefit from the insurance policy. See *Northern Security Ins. Co. v. Mitec Telecom, Inc.*, 38 F. Supp. 2d 345, 346 n.1 (D. Vt. 1999) (noting that, although "Mitec Telecom has alleged that it 'acquired [Mitec Systems'] rights under the . . . [NSIC] Policy,'" Mitec Telecom had not "provided the Court with facts concerning a relationship . . . between Mitec Systems and Mitec Telecom").

both the opinion and Mitec Telecom's pleadings in the coverage action in the federal district court. See *Northern Sec. Ins. Co. v. Mitec Telecom, Inc.*, 38 F. Supp. 2d at 346 n.1 ("Mitec Telecom has alleged that it 'acquired [Mitec Systems'] rights under the . . . Policy issued by [NSIC.]"). Mitec Telecom and Mitec Electronics now dismiss the federal court's statement as "cryptic" and a "mere interlocutory order" that has no preclusive effect. But Mitec Telecom cannot disavow its own statement in the earlier litigation. That statement was quoted verbatim by the federal court in its order, and is part of the record in this case.

¶ 18. In sum, Mitec Telecom and Mitec Electronics claim coverage, under a policy purchased in Vermont from a Vermont agent and issued by a Vermont company, for liability arising out of claims relating to real property in Vermont, while simultaneously disclaiming Vermont courts' jurisdiction to rule on that very coverage claim. The Due Process Clause does not require such an odd result, and the trial court did not err in concluding that it had jurisdiction over Mitec Telecom and Mitec Electronics in the coverage dispute.

## III. The General Release

¶ 19. Defendants contend that the 1989 release, executed by Myer Bentob on behalf of Mitec Systems, does not bar Mitec Telecom from obtaining coverage under the policy for liabilities arising from the Bates lawsuit. They advance two reasons for this: (1) the release does not bar future and unknown claims; and (2) the release does not bind any entity other than Mitec Systems. The superior court concluded, to the contrary, that "the Mitec defendants in existence in 1989 [i.e., Mitec Manufacturing and Mitec Electronics] were affiliates of Mitec Systems for the purposes of the release and are . . . precluded from raising any claims against [NSIC] based on the policy." Mitec Electronics and Mitec Manufacturing merged in 1991, and in 1996 merged with another Canadian corporation to form Mitec Telecom. Accordingly, the court granted summary judgment to NSIC on this issue, declaring that NSIC was not obligated to defend or indemnify any defendants.

¶ 20. We review the grant of summary judgment de novo, applying the same standard as the trial court. *Johnson v. Harwood*, 2008 VT 4, ¶ 5, 183 Vt. 157, 945 A.2d 875. Summary

judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bacon v. Lascelles*, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996). A release between an insurer and its insured is a contract, *Leo v. Hillman*, 164 Vt. 94, 104, 665 A.2d 572, 579 (1995), and its interpretation is a question of law. *Morrisseau v. Fayette*, 164 Vt. 358, 366, 670 A.2d 820, 826 (1995). As with any contract, our task in interpreting it is to ascertain the intent of the parties at the time of execution. Releases must be specific in order to be valid and are interpreted narrowly, as a general matter. *Inv. Props., Inc. v. Lyttle*, 169 Vt. 487, 497, 739 A.2d 1222, 1229 (1999).

¶ 21. The release here provided as follows:

> Mitec Systems Corporation[,] for and in consideration of the sum of [$16,250] paid by [NSIC] . . . by these presents does for its successors, affiliates and assigns, remise, release and forever discharge [NSIC] . . . of and from all, and all manner of action and actions, cause and causes of action, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or in equity, which against the said [NSIC,] its successors, affiliates or assigns ever had, now has or which hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of these presents. Included herein, but not in limitation hereof, are all claims that were asserted or could have been asserted in *Mitec Systems Corporation v. Northern Security Insurance Company*, Chittenden Superior Court, Docket No. S515-88CnC.

A. Whether the release extends to future, unknown claims

¶ 22. Defendants would have us find error in the superior court's conclusion that this language operates to bar coverage for future claims, including the Bates lawsuit, arising out of events that occurred before the release was executed. Defendants assert that the release bars coverage only for claims arising out of *lawsuits filed* against Mitec before the release was executed, but not for after-filed claims, like this one, that arise out of *events* that occurred before the release. We disagree.

¶ 23. None of our cases is directly on point, but the release we are called upon to interpret today is strikingly similar to one that was before the United States Court of Appeals for the Third Circuit in *Fisher Development Co. v. Boise Cascade Corp.*, 37 F.3d 104 (3d Cir. 1994). There, Fisher released Boise Cascade from all claims that it "ever had, now has or hereafter can, shall, or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the day and date of these Presents." *Id.* at 106. Noting that this release was of a type "regularly utilized," the Third Circuit concluded that "[i]ts language evidences an intent on the part of Fisher to release all claims *based on events* occurring from 'the beginning of the world' to the date of the execution of the release." *Id.* at 108 (emphasis added). The court went on: "[W]e can only take the phrase 'hereafter may have' to mean that the parties wished to release not only those claims of which they were currently aware, but *also those they might subsequently discover* based on their relationship prior to the execution of the release." *Id.* (emphasis added). The Third Circuit declined to consider extrinsic evidence purportedly bearing on the question of whether the release barred future claims arising from past events, instead concluding that the release unambiguously barred such claims. *Id.* at 109 ("While [the release] does not use the words 'future unknown liability,' future unknown liabilities based on events occurring before the release are clearly covered.").

■■ ■■ ¶ 24. The language in the release before us is virtually indistinguishable from the language analyzed in *Fisher*, and we decline to give it the crabbed reading proposed by defendants. That reading would render portions of the release mere surplusage, a result we strive to avoid in interpreting contracts. See *Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 580, 556 A.2d 81, 85 (1988) (noting that we strive to give effect to all material parts of contracts). Nor are we persuaded by defendants' argument that the release "makes no reference to unknown or future claims" and that such claims are therefore not released. The release here explicitly covers claims that Mitec Systems or its successors, affiliates, and assigns "hereafter can, shall, or may have." This language plainly refers to the future, and to claims that Mitec Systems or its successors "may have" but which were not known at the time of the release. We agree with the *Fisher* court that such language unambiguously includes future claims arising out of

events — here, the pollution in the Alling Industrial Park — that occurred before the release.

¶ 25. Defendants also cite several cases construing language different from that in the instant release, in support of an inference that *only* language like that cited in those cases will operate to bar future claims. See, e.g., *Boles v. Blackstock*, 484 So. 2d 1077, 1080-81 (Ala. 1986) (release barring recovery for *"all injuries, known and unknown"* and *"precluding forever any further or additional claims arising out of [a particular] accident"* was unambiguous); *Bernstein v. Kapneck*, 430 A.2d 602, 609 (Md. 1981) (release of claims *"known and unknown, and which have resulted or may in the future develop"* barred claim for damages for later-discovered personal injuries; "the release could not be more clear, more specific, more complete, more all-inclusive or more all-embracing"); *Emery v. Mackiewicz*, 240 A.2d 68, 70 (Pa. 1968) (release barring *"claims that are known and unknown, suspected and unsuspected"* would be given effect; "release . . . could not possibly be . . . more completely all-inclusive and all-embracing").

¶ 26. It needs no prolonged discussion, however, to conclude that those cases do not, and as a matter of logic cannot, have the effect defendants urge. The cases simply hold that future claims based on past events *are* barred by particular releases, not that such claims *are not* barred by other releases. Several of the courts in the cases cited were at pains to state that the language they interpreted was so completely clear that it would "turn[] the English language on its head" to conclude that the releases did not bar future, unknown claims. *Bernstein*, 430 A.2d at 609; accord *Emery*, 240 A.2d at 70 ("It would make a mockery of the English language and of the Law to permit this release to be circumvented or held to be nugatory."). While the release here may not rise to the same level of redundancy as those in *Emery* and *Bernstein*, it is nonetheless unambiguous. Accordingly, the trial court did not err in concluding that the release barred coverage for future unknown liabilities, including the Bates lawsuit, that arose from the Alling pollution.

## B. Whether Mitec Telecom is bound by the release

¶ 27. It remains to determine, however, whether the release barred Mitec Telecom's coverage claims. Mitec Telecom contends that it is not a successor, affiliate, or assign of Mitec Systems, and

that its coverage rights — which it asserts derive from Mitec Manufacturing's rights — are therefore unaffected even if the release does extend to future claims by Mitec Systems' successors. We do not agree.

¶ 28. In interpreting the language of the release, as with any contract, our goal is to give effect to the intent of the parties. *State v. Philip Morris USA, Inc.*, 2008 VT 11, ¶ 13, 183 Vt. 176, 945 A.2d 877. We presume that the parties' intent is reflected in the plain language of the release when that language is clear. *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078.

¶ 29. The release here binds "successors, affiliates, and assigns" of Mitec Systems. Defendants' principal argument against the superior court's conclusion in this regard is that the court erroneously concluded that Mitec Telecom is a "successor to two affiliates" of Mitec Systems. According to defendants, Telecom itself is neither a successor to, nor an affiliate of, Mitec Systems, and thus is not bound by the release. The argument very nearly defeats itself. A general release is meant to buy peace from a discrete set of claims. Here, NSIC paid consideration to Mitec Systems in exchange for a release from liability for coverage claims by Mitec Systems and its successors and affiliates. NSIC's purchase would be hollow indeed if the releasor's affiliates — i.e., Mitec Manufacturing or Mitec Electronics — could unilaterally reimpose liability on NSIC simply by changing their corporate form once, to become a "successor to two affiliates."

¶ 30. The summary-judgment evidence amply supported this conclusion. The trial court's summary-judgment order largely cited plaintiff's pleadings and exhibits for factual support. The "once-removed" citations here erect no great obstacle to our review, and we decline to reverse on that basis, as defendants urge us to. We briefly recount the undisputed facts relied on by the superior court.

¶ 31. The court found that Mitec Electronics provided a letter of credit to the State on behalf of Mitec Systems as part of the 1986 settlement of the original pollution claims. Defendants do not dispute this fact. The court also found that Mitec Systems sold its assets to Mitec Manufacturing at an inflated price (many of these assets, it is worth noting, were purchased from Mitec Manufacturing just a few years before). Contrary to the claim that

defendants continue to press — that there was a "complete lack of any corporate relationship among Systems, Electronics, and Telecom" — the trial court found that there was a "unity of control and ownership" of all the Mitec companies; that the companies all "worked hand in glove as if part of a larger company"; and that Mitec had shown no facts that would rebut that conclusion. There was no error in concluding that Mitec Telecom, as successor to one or more affiliates of Mitec Systems, was bound by the general release.

¶ 32. Finally, we note again that Mitec Telecom explicitly claimed coverage as a successor to Mitec Systems in the earlier federal action arising out of the Bates-lawsuit coverage dispute, see *supra*, ¶¶ 17-18, which is to say that Mitec Telecom's own explicit understanding, at least in 1999, was that it was itself a successor to Mitec Systems. Mitec Telecom cannot avoid the release.

## IV. The Rule 15 Motion

¶ 33. On July 16, 2004, NSIC moved, pursuant to V.R.C.P. 15(a), to amend its complaint to insert a "Count II," seeking reimbursement of fees, after the existing declaratory-judgment count. That same day, defendants filed a timely notice of appeal. On July 30, 2004, the trial judge instructed counsel for both parties to discuss whether the court had jurisdiction over the motion to amend in light of the notice of appeal. The parties were unable to reach agreement on the issue, and NSIC filed a supplementary memorandum in support of the motion to amend on September 3, 2004. Before defendants responded to that memorandum, the docket clerk erroneously filed the notice of appeal with this Court. On October 5, 2004, the parties filed a joint motion and stipulation requesting that we remand the matter to the superior court to determine "whether there has been a final order in this case from which an appeal lies and, if not, whether it should grant [NSIC's] Motion to Amend." We dismissed the appeal and remanded "pursuant to the stipulation."

¶ 34. We review the superior court's decision on the motion to amend the complaint for abuse of discretion. *Perkins v. Windsor Hosp. Corp.*, 142 Vt. 305, 313, 455 A.2d 810, 815 (1982). Amendments may be allowed with leave of the court at any time. *Lillicrap v. Martin*, 156 Vt. 165, 170, 591 A.2d 41, 43-44 (1989).

Our review is complicated somewhat by the court's decision to treat the motion to amend *the complaint*, see V.R.C.P. 15(a), as a motion to amend *the judgment*, see V.R.C.P. 59(e). Our review of Rule 59 motions is also for abuse of discretion. *Davis v. Manning*, 143 Vt. 311, 314, 465 A.2d 1352, 1353 (1983). We view the evidence in the light most favorable to the prevailing party when reviewing the disposition of a Rule 59 motion. *Newkirk v. Towsley*, 134 Vt. 237, 238, 357 A.2d 117, 118 (1976).

## A. The order of filing

¶ 35. We first consider defendants' contention that filing the notice of appeal divested the superior court of jurisdiction to consider the motion to amend the complaint. Defendants argue, citing the superior court's docket sheet, that the notice of appeal was filed before the motion to amend, thereby rendering the latter a "nullity."

¶ 36. The trial court — the very tribunal in which both the motion to amend and the notice of appeal were filed — found that it "cannot determine which of the two was first filed on July 14th." Accordingly, the trial court treated the motions as simultaneously filed. Defendants cite only the trial court's docket sheet to support their contrary contention that the motion to amend was filed after the notice of appeal, and yet do not explicitly claim error in the trial court's finding that it could not determine the order of filing. We will not assume, based only on defendants' conclusory statements, that the trial court misinterpreted its *own* docket sheet or docketing practices, and we will treat the motion to amend and the notice of appeal as simultaneous. Defendants have other claims, however.

## B. The right to amend

¶ 37. Defendants argue that, even if the notice of appeal is deemed to have been filed after — or at the same time as — the motion to amend, the right to amend the complaint had terminated because the action was already final. We agree.

¶ 38. Rule 15(a) provides that leave to amend the complaint "shall be freely given when justice so requires," and we have repeatedly held that trial courts are to be liberal in permitting amendments to the pleadings. See, e.g., *Lillicrap*, 156 Vt. at 170, 591 A.2d at 44; *Desrochers v. Perrault*, 148 Vt. 491, 493, 535 A.2d

334, 336 (1987). This policy of liberality rests on three principal goals: (1) to ensure maximum opportunities for claims to be decided on their merits rather than on procedural niceties; (2) to provide notice of claims and defenses; and (3) to enable parties to raise claims that were overlooked or unknown earlier in the proceedings. *Bevins v. King*, 143 Vt. 252, 255, 465 A.2d 282, 283 (1983).

¶ 39. Defendants argue that NSIC's right to amend the complaint under Rule 15 terminated when judgment was entered. As the record makes clear, judgment was entered on June 1, 2004. At that time, the action was final under our rules. See V.R.C.P. 58 and 79. We therefore agree with defendants that the right to amend under Rule 15 no longer attached when the motion was filed· on June 14. It remains to decide whether the trial court properly concluded that Rule 59(e) provided a procedural avenue for NSIC's recoupment claim.

## C. Rule 59(e)

¶ 40. Defendants contend that the superior court erred in "[f]abricating" a Rule 59(e) motion, and in deciding that motion without notice or briefing when it "clearly was not ripe for decision." But it is clear from the record that defendants were on notice that the motion might be treated as a Rule 59(e) motion. NSIC's reply to defendants' motion to strike the motion to amend explicitly averred that the motion to amend could be considered under V.R.C.P. 59. We do agree with defendants, however, that the court erred in determining that Rule 59(e) was available to plaintiff under these facts.

¶ 41. Rule 59(e) allows motions to "alter or amend the judgment" if made within ten days of the entry of judgment. The motion to alter "allows the trial court to revise its initial judgment if necessary to relieve a party against the unjust operation of a record resulting from the mistake or inadvertence of the court and not the fault or neglect of a party." *Osborn v. Osborn*, 147 Vt. 432, 433, 519 A.2d 1161, 1163 (1986) (quotation omitted). "The 'narrow aim' of Rule 59(e) is 'to mak[e] clear that the district court possesses the power' to rectify its own mistakes in the period immediately following the entry of judgment." *Greene v. Town of Blooming Grove*, 935 F.2d 507, 512 (2d Cir. 1991) (quoting *White v. N.H. Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982)).

¶ 42. The superior court determined, citing authorities construing Rule 59(e), that it would be "manifest injustice" to put NSIC in the "position of having paid out a very substantial amount to defend a pollution claim, having won the issue that it was not actually obligated to have borne those expenses, and yet being barred from ever recovering them because a res judicata defense will be interposed to a . . . later action initiated for the purpose." See 11 C. Wright et al., Federal Practice and Procedure § 2810.1, at 124-26 (2d ed. 1995) (noting that one of the "four basic grounds" on which a Rule 59(e) motion may be granted is to prevent manifest injustice).

¶ 43. The cases cited in the treatise relied on by the trial court are illustrative of the "manifest injustice" cases generally, and are also strikingly dissimilar from the facts before us here. In the first case cited, *Atlantic States Legal Foundation, Inc. v. Karg Bros., Inc.*, 841 F. Supp. 51 (N.D.N.Y. 1993), the district court granted a motion under F.R.C.P. 59(e) to prevent the injustice that would have resulted from the court's own earlier misinterpretation of the governing law. *Id.* at 54 ("Now, after reconsidering its prior analysis in the context of the relevant statutory scheme . . . the court believes that its earlier ruling was in error."). In the second case in the treatise, *Database America, Inc. v. Bellsouth Advertising & Publishing Corp.*, 825 F. Supp. 1216 (D.N.J. 1993), the "manifest injustice" language was the barest dictum. *Database America* was ultimately decided on the basis that the district court, having already transferred the case at issue to another court, had no jurisdiction over the Rule 59(e) motion in the first instance.

¶ 44. NSIC admits, as it must, that it "could have brought a contingent claim for reimbursement sooner," but argues that "it was not compelled to do so, particularly prior to termination of the defense or favorable ruling on coverage." The same treatise cited by the superior court for the "manifest injustice" standard also discusses cases like this one, where a party could have, but did not, raise a particular claim for relief in its complaint: "The Rule 59(e) motion *may not be used* . . . to raise arguments . . . that could have been raised prior to the entry of judgment." 11 C. Wright et al., *supra*, § 2810.1, at 127-28 (emphasis added). Illustrative of this line of cases is the United States Court of Appeals for the Seventh Circuit's decision in *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260 (7th Cir. 1986). There, an attempt

was made, via a Rule 59(e) motion, to challenge an affidavit introduced without objection at trial. The appellate court rejected the attempt, holding that "[m]otions . . . to alter or amend a judgment must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Id.* at 1268. To similar effect, under more similar procedural facts, is another Seventh Circuit case, *Harris v. City of Auburn*, 27 F.3d 1284 (7th Cir. 1994), in which the court rebuffed an attempt to amend a complaint using Rule 59(e). The court held as follows:

> But, the presumption that leave to amend shall be freely given pursuant to Rule 15(a) disappears after judgment has been entered. *First Nat'l Bank v. Continental Illinois Nat'l Bank*, 933 F.2d 466, 468 (7th Cir. 1991). At this juncture, the party making a Rule 59(e) motion so that it can amend its complaint had better provide the district court with a good reason to grant its motion.

*Id.* at 1287. The *Harris* court went on to conclude that a power outage in an attorney's office was not a "good reason" to grant the motion under Rule 59(e). *Id.* It bears repeating that NSIC has not advanced *any* reason for not including the attorney's fees claim in the complaint, apart from the unsupported statement that the claim did not "ripen" until the Bates lawsuit settled and the declaratory judgment was entered.

¶ 45. We have not reviewed facts exactly like those presented here, but did once suggest in dicta that a party awarded its "costs of action" might have used a timely Rule 59(e) motion as a vehicle to determine whether that phrase included attorney's fees. *State v. Champlain Cable Corp.*, 147 Vt. 436, 441, 520 A.2d 596, 600 (1986). In *Champlain Cable*, of course, the State had actually requested attorney's fees in its complaint, and had received a judgment that was ambiguous as to those fees. *Id.* at 438, 520 A.2d at 598. The *Champlain Cable* dictum is consistent with the corrective purpose of Rule 59(e); there, the court's arguably ambiguous order might have provided a basis for Rule 59(e)'s availability. Here, by contrast, NSIC's complaint did not so much as mention reimbursement of attorney's fees. Thus, any supposed "mistake" in the judgment here was entirely due to the "fault or neglect" of a party, and is outside the power of Rule 59(e) to correct. See *Osborn*, 147 Vt. at 433, 519 A.2d at 1163

(purpose of Rule 59(e) is to allow correction of mistakes *made by the court*).

¶ 46. Accordingly, we conclude that the superior court abused its discretion in granting NSIC's post-judgment motion to amend the complaint or vacate the judgment. Neither Rule 15 nor Rule 59(e) provides relief from NSIC's own failure to timely raise the recoupment claim. Because we conclude that the trial court erred in considering the recoupment claim at all, we do not review the court's disposition of the claim itself.

*The award of attorney's fees is vacated; the judgment as to Myer Bentob is vacated; the judgment below is affirmed in all other respects.*