NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 51

No. 24-AP-295

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, Civil Division |
| | |
| Meta Platforms, Inc. et al. | June Term, 2025 |

Helen M. Toor, J.

Charity R. Clark, Attorney General, Jonathan T. Rose, Solicitor General, and Merideth C. Chaudoir, Jill S. Abrams, Rizlaine M. Sabiani, Assistant Attorneys General, Montpelier, and Roger Perlstadt, Alexander G. Tievsky, Shantel Chapple Knowlton, Theo Benjamin, Emily Penkowski Perez, Chicago, Illinois, Jimmy Rock, Washington, DC, and John Feeney-Coyle, Boulder Colorado, of Edelson PC, for Plaintiff-Appellee.

Ritchie E. Berger, Kendall Hoechst, and Anne Rosenblum of Dinse P.C., Burlington, and Mark W. Mosier of Covington & Burling LLP, Washington, DC, for Defendants-Appellants.

Carl "Ott" Lindstrom of Paul Frank + Collins P.C., Burlington, and Anne M. Voigts of Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, California, for Amici Curiae Professors Alan Trammell and Derek Bambauer in Support of Defendants-Appellants.

Kevin A. Lumpkin of Sheehey Furlong & Behm P.C., Burlington, for Amicus Curiae Netchoice.

Brady C. Toensing of diGenova & Toensing, LLP, Washington, DC, Eric H. Wessan, Solicitor General, Des Moines, Iowa, and David H. Thompson, Brian W. Barnes, and Megan M. Wold of Copper & Kirk, PLLC, Washington, DC, for Amicus Curiae State of Iowa and 46 Other States and Commonwealths in Support of Plaintiff-Appellee Vermont.

PRESENT: Reiber, C.J., Eaton, Carroll and Waples, JJ., and Dooley, J. (Ret.), Specially Assigned

¶ 1. **CARROLL, J.** This interlocutory appeal requires us to evaluate the constitutionality of a Vermont court's exercise of personal jurisdiction over nonresident defendants

who allegedly violated the Vermont Consumer Protection Act (VCPA) through their design and operation of an online application. We affirm.

I.

¶ 2. This action commenced when the State of Vermont filed suit against defendants Meta Platforms, Inc., and its wholly owned subsidiary Instagram, LLC,[1] alleging Meta engaged in unfair and deceptive business practices, thereby violating the VCPA, 9 V.S.A. § 2453. Specifically, the State alleged that Meta "engaged in and are continuing to engage in unfair acts and practices in commerce . . . which are immoral, unethical, oppressive or unscrupulous; or cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." See id. § 2453(a). Additionally, the State claimed that Meta violated the VCPA, "by making material misrepresentations that are likely to deceive a reasonable consumer." The State brought the suit to further its interest "in ensuring entities that do business in Vermont do so in a lawful manner" and "to enforce the [VCPA's] prohibitions on unfair and deceptive acts and practices in commerce." See id. § 2458; 3 V.S.A. § 157.

¶ 3. Broadly, the complaint alleges Meta intentionally designed Instagram to be addictive to teens, that Meta did so to increase advertisement revenue despite knowing the resulting negative effects on teens, and that Meta failed to take meaningful action to mitigate these harms while both actively minimizing and withholding its relevant internal research findings to maintain teens' engagement with the application.

¶ 4. In support of these claims, the State's complaint alleges the following as relevant to this appeal. Meta and Instagram are each a Delaware corporation and limited-liability company, respectively, with their principal places of business in California. Meta operates Instagram—a

---

[1] For consistency with the record on appeal and the parties' briefing in this case, we refer to defendants collectively as Meta in this opinion unless specified otherwise.

2

widely used social-media platform—nationwide, including in Vermont. Approximately 22 million teenagers access Instagram daily in the United States. In Vermont, more than 40,000 "teens" aged thirteen to seventeen used Instagram monthly and at least 29,000 "teens" used Instagram daily between July 2020 and June 2021. And from October 2022 to April 2023, more than 76,000 "young adults" aged eighteen to twenty-four used Instagram monthly in Vermont and more than 48,000 young adults used Instagram daily. At times, more teens and young adults in Vermont used Instagram, per capita, than in any other state.

¶ 5. Meta does not charge Instagram users directly for use of the platform. Instead, to access Instagram, users must agree to allow Meta to collect a variety of personal information, including their age, location, and other demographics. Meta then generates revenue by selling advertising space on Instagram to businesses and organizations seeking to target users with given characteristics. Meta sold advertisement space to Vermont-based businesses targeting Vermont markets and Vermont teens specifically. In 2022, advertising revenue accounted for ninety-eight percent of Meta's total $116.6 billion in revenue, of which $51.4 billion was attributable to Instagram.

¶ 6. Meta's business model depends on advertising revenue. This business model "incentivizes Meta to maximize the amount of time that consumers spend on Instagram," including "increas[ing] the engagement of Vermont teens." As the State claims, "the more time consumers spend on Instagram, the more 'ad space' Meta has to sell."

¶ 7. Meta looks to Vermont for "valuable-research grounds" and has "historically tracked Instagram's performance in Vermont." Meta conducted a national study of teen Instagram use in 2017, assessing various metrics for each state. As part of this study, Meta found that Vermont teens spent less time daily on Instagram than several other states, but also determined that Instagram's market penetration was higher than in any other state. From this research, Meta concluded it "need[ed] to build better features/products to make teens more engaged on

3

[Instagram]." (Second alteration in original.) Meta also looked to "the top ten cities" in four states, including Vermont, in more detail after concluding that certain "trends in states may be skewed by certain cities in them."

¶ 8. The State also alleges that Meta has "deceptively misled Vermont consumers" about the safety of Instagram. The State claims that for years Meta "has promoted misleading messages and metrics about the incidents of harms to [individuals under the age of eighteen] on the platform." Specifically, the State alleges that Meta, in testimony before the U.S. Congress, "downplayed the meaning of leaked internal Meta research on Instagram's harms to youth and teen girls, in particular; deceptively testified that Instagram is safe and provides age-appropriate experiences; and deceptively testified that Instagram does not cause compulsive and excessive platform use." Additionally, the State alleges that Meta "failed to disclose" its findings "that Instagram causes compulsive and excessive platform use" which harms young users. According to the State, the misrepresentations and omissions affected consumers' decisions to use the application. "Meta preferred to maintain the façade because the truth . . . would undermine public 'sentiment' regarding Meta, and therefore undermine Meta's business interests."

¶ 9. Meta moved to dismiss the complaint for, inter alia, lack of personal jurisdiction under Vermont Rule of Civil Procedure 12(b)(2). The court denied Meta's motion on the ground that Vermont has specific jurisdiction over Meta for these claims. The court found the State alleged sufficient facts to establish a prima facie case of jurisdiction. Specifically, the court concluded that Meta entered into contracts with Vermont users, sold advertisements to Vermont businesses to target Vermont users, and tracked and studied Vermont teens' use of Instagram. It concluded that these connections were sufficiently related to the State's claims, and that it would not otherwise be unfair to assert personal jurisdiction over Meta in this case.

¶ 10. Meta moved for permission to appeal the court's interlocutory order denying its motion to dismiss pursuant to Vermont Rule of Appellate Procedure 5(b)(1). The court granted

4

permission to appeal its ruling on personal jurisdiction, and we accepted the appeal of this issue. See V.R.A.P. 5(b)(1), (6).

II.

¶ 11.   On appeal, Meta maintains that Vermont lacks specific personal jurisdiction over Meta and that the State's complaint must be dismissed.  Specifically, Meta argues that specific personal jurisdiction is lacking because Meta's contacts with Vermont were not purposefully directed at Vermont, none of the misrepresentations were made in or aimed at Vermont, and that the State's claims do not arise out of or relate to any of the alleged connections Meta has with Vermont.

¶ 12.   "We review the superior court's decision on the motion to dismiss de novo." N. Sec. Ins. Co. v. Mitec Elecs., Ltd., 2008 VT 96, ¶ 13, 184 Vt. 303, 965 A.2d 447.  This Court's "review of the trial court's legal analysis concerning personal jurisdiction is nondeferential and plenary." State v. Atl. Richfield Co., 2016 VT 22, ¶ 9, 201 Vt. 342, 142 A.3d 215 (quotation omitted).  "Where no evidentiary hearing is held on the jurisdictional issue, the Court must consider the pleadings . . . in a light most favorable to the plaintiff." N. Sec. Ins. Co., 2008 VT 96, ¶ 15 (alteration and quotation omitted).  The plaintiff need "make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction." Id. (quotation omitted).

¶ 13.   "Vermont courts must have both statutory and constitutional power to exercise personal jurisdiction over a nonresident defendant." Fox v. Fox, 2014 VT 100, ¶ 9, 197 Vt. 466, 106 A.3d 919.  "Vermont's long-arm statue, 12 V.S.A. § 913(b), confers jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." Dall v. Kaylor, 163 Vt. 274, 275, 658 A.2d 78, 79 (1995).  Accordingly, we resolve the jurisdictional issue "under federal constitutional law." N. Aircraft, Inc. v. Reed, 154 Vt. 36, 41, 572 A.2d 1382, 1386 (1990). So "although the long-arm statue and the U.S. Constitution provide separate and distinct

5

limitations on the authority of Vermont courts to enter judgments, the statutory and constitutional analyses in the case are one and the same." Fox, 2014 VT 100, ¶ 9.

¶ 14. Under the Due Process Clause, a state court may assert personal jurisdiction over a defendant if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation omitted). The U.S. Supreme Court has recognized two forms of personal jurisdiction: general jurisdiction and specific jurisdiction. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 592 U.S. 351, 358 (2021). "A state court may exercise general jurisdiction only when a defendant is essentially at home in the State." Id. (quotation omitted). Here, the parties do not dispute on appeal that Vermont cannot assert general jurisdiction over Meta and thus our analysis focuses on specific jurisdiction.

¶ 15. Specific jurisdiction is a claim-specific inquiry. Ford Motor Co., 592 U.S. at 359. To be subject to specific jurisdiction, the defendant (1) "must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State" and (2) the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." Id. (alteration and quotations omitted). "[T]he critical consideration is whether 'the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there.' " N. Aircraft Inc., 154 Vt. at 41, 572 A.2d at 1386 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). This "prevents a defendant from being subjected to jurisdiction on the basis of fortuitous, attenuated, or random contacts." Dall, 163 Vt. at 276, 658 A.2d at 79 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). But when "a company exercises the privilege of conducting activities within a state—thus enjoying the benefits and protection of its laws—the State may hold the company to account for related misconduct." Ford Motor Co., 592 U.S. at 360 (alterations and quotation omitted).

6

¶ 16.    Neither this Court nor the U.S. Supreme Court has directly addressed how specific personal jurisdiction is analyzed when out-of-state defendants operate an internet-based application with no physical presence in the forum state.  However, other courts considering the question have consistently held that "traditional statutory and constitutional principles remain the touchstone of the inquiry."  Best Van Lines, Inc. v. Walker, 490 F.3d 239, 252 (2d Cir. 2007) (quotation omitted); see also, e.g., Herbal Brands, Inc. v. Photoplaza, Inc., 72 F.4th 1085, 1093 (9th Cir. 2023) ("Although the internet can be dizzingly complex, for jurisdictional purposes, the act of selling physical products over the internet to a forum resident is substantially the same as selling those same products to a forum resident through a mail-order catalog."), cert. denied, __ U.S. __, 144 S. Ct. 693 (2024); Admar Int'l, Inc. v. Eastrock, L.L.C., 18 F.4th 783, 786 (5th Cir. 2021) ("The analysis applicable to a case involving jurisdiction based on the internet should not be different at its most basic level from any other personal jurisdiction case." (quotation omitted)).[2]

A.

¶ 17.    We first address whether, taking the facts in the State's complaint as true and considering them in the light most favorable to the State, there is a basis to demonstrate that Meta has sufficient minimum contacts with Vermont.  Ford Motor Co., 592 U.S. at 359 (noting these contacts "often go by the name 'purposeful availment' " (quoting Burger King Corp., 471 U.S. at 475)).  These minimum contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.' "  Id. (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)).  "They

---

[2]    Some courts apply the "sliding-scale" or "interactivity" test established in Zippo Manufacturing Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).  This test compares a website's level of interactivity to whether a website purposefully avails itself of the forum state.  Id.  As the Second Circuit has explained, however, "[Zippo] does not amount to a separate framework for analyzing internet-based jurisdiction."  Best Van Lines, Inc., 490 F.3d at 252 (quotation omitted).  In this case, the trial court recognized the Zippo test was established "over twenty years ago" and "is out of pace with the changes in internet-based businesses over recent decades" and did not assess whether the level of Instagram's interactivity was sufficient to support jurisdiction.  On appeal, Meta does not challenge the court's conclusion and neither party engages in a Zippo analysis.  Accordingly, we apply the traditional minimum-contacts test.

7

must show that the defendant deliberately 'reached out beyond' its home—by, for example, 'exploit[ing] a market' in the forum State or entering a contractual relationship centered there." Id. (alteration in original) (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)).

¶ 18. The complaint argues that Vermont has personal jurisdiction over Meta because Meta entered into contracts with Vermonters, offered them a social-media service, obtained their personal data which allowed it to sell "advertising targeted to Vermonter[s]" to Vermont businesses, and "engaged in unlawful practices in Vermont against Vermont consumers." Meta counters that none of the alleged contacts are sufficient because they are not purposefully directed at Vermont.

¶ 19. A defendant's continuous and deliberate "exploit[ation]" of the forum state's market is sufficient to satisfy the minimum-contacts requirement. Keeton, 465 U.S. at 781. In Keeton v. Hustler Magazine, Inc., an out-of-state magazine was sued for libel in New Hampshire. The magazine was "a national publication aimed at a nationwide audience" and the magazine's only contacts with New Hampshire were the sale of ten-to-fifteen-thousand copies of its magazine in the state each month. Id. at 772, 781. The Supreme Court held that because the defendant "continuously and deliberately exploited the New Hampshire market, it must reasonably anticipate being haled into court there" and there was "no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed" for claims related to that business. Id. at 781.

¶ 20. Likewise, the facts pled indicate that Meta operates a nationwide social-media application used by a nationwide audience, including Vermont. Additionally, over 29,000 Vermont teens use Instagram daily and upwards of 40,000 Vermont teens used Instagram monthly, and Meta regularly engages with these users by entering into contractual agreements in which they collect a variety of personal information. Further, Meta has specifically studied Vermont teen Instagram users to increase their engagement and concurrently its revenue by selling more

advertisement space to Vermont businesses that target these teens. As such, like the defendant in Keeton, Meta "continuously and deliberately exploit[s] the [Vermont] market" and must "reasonably anticipate being haled into court" here. Id. at 781. As part of its business model, Meta purposefully avails itself of Vermont. The fact that Instagram is available everywhere and not only in Vermont is inapposite under the analysis set forth by Keeton. See uBID, Inc. v. GoDaddy Grp., Inc., 623 F.3d 421, 428 (7th Cir. 2010) (rejecting defendant's arguments that advertisements in forum state were part of national campaign and exploitation of market was indistinguishable from national presence (citing Keeton, 465 U.S. at 744)).[3]

¶ 21.    Meta attempts to distinguish Keeton on the ground that Meta has not physically shipped goods to Vermont, i.e., Instagram is only available virtually and Meta made no physical entry into the State, unlike the defendant in Keeton that shipped its magazine to New Hampshire. As we have recognized, "[a]s technology and economic practices diminish the importance of geographic boundaries, it is not unreasonable to anticipate the expansion of personal jurisdiction to those who deliberately transcend those boundaries in pursuit of economic gain." Dall, 163 Vt. at 277, 658 A.2d at 80. We need not decide, however, whether Meta's virtual presence in Vermont is comparable to its physical presence. Nothing in Keeton suggests that the holding is limited to, or that the Court depended on, the defendant's shipment of physical goods into the forum state. And while "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact," "physical presence in the forum is not a prerequisite to jurisdiction." Walden, 571 U.S. at 285 (citing Burger King Corp., 471 U.S. at 476; Keeton, 465 U.S. at 773-74).

---

[3]    Because defendant's connection to and purposeful availment of a forum need not be unique to that forum in order for specific jurisdiction to attach, Meta's argument that the trial court erred in declining to decide, in the order on appeal, whether Meta's connections to Vermont were unique is without merit.

¶ 22. Keeton stands for the proposition that a defendant's continuous and deliberate exploitation of the forum state's market justifies a finding of jurisdiction. And "[s]ending tens of thousands of magazines to a state is an affirmative act that displays the publisher's specific intent to target that state." Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 325 (5th Cir. 2021). Meta's engagement with Vermonters on its platform and with Vermont businesses is an affirmative act that displays its "specific intent to target" Vermont and continuously and deliberately exploit the Vermont market. Id.

¶ 23. The focus of the analysis is whether the defendant "purposefully availed [itself] of the privilege of conducting business" in the forum state, UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 353 (4th Cir. 2020) (citing Burger King Corp., 471 U.S. at 472), by "direct[ing] its business activities" there, regardless of whether it has also done so in other states or physically shipped goods to the state. uBID, Inc., 623 F.3d at 428. In uBID, Inc. v. GoDaddy Grp., Inc., the plaintiff sued an out-of-state defendant in Illinois for violating an anti-cybersquatting consumer-protection act. While virtually all of the defendant's physical presence was in Arizona, it advertised broadly and had customers across the country. The complaint alleged that the defendant allowed its customers to buy domain names similar to the plaintiff's name, which harmed the plaintiff and generated advertisement revenue for the defendant. The defendant raised many of the issues Meta does in this case: It argued that its advertisements were not directed at Illinois in particular and that its exploitation of the Illinois market was indistinguishable from its national presence. Id. at 428. The Seventh Circuit, relying on Keeton, rejected these arguments—"a typical business that operates on a national scale with [the defendant's] sales in Illinois, [the defendant's] customer base in Illinois, and [the defendant's] blanket of advertising in Illinois would unquestionably be subject to personal jurisdiction there for claims arising from its business activities that reach into the State." Id. at 429; cf. be2 LLC v. Ivanov, 642 F.3d 555, 559 (7th Cir. 2011) (distinguishing uBID, Inc. and noting "[a]ll that [plaintiff] submitted regarding [defendant's]

10

activity related to Illinois is the Internet printout showing that just 20 persons who listed Illinois address had at some point created free dating profiles on [defendant's website]").

¶ 24.   The Indiana Court of Appeals addressed this issue more recently in a case similar to this one.  In that case, the State of Indiana sued TikTok, Inc., a company that "operates a digital application" that "was the most downloaded app globally in 2022," alleging "that TikTok had engaged in deceptive acts under Indiana's Deceptive Consumer Sales Act."  State v. TikTok Inc., 245 N.E.3d 681, 685 (Ind. Ct. App. 2024), transfers denied, 262 N.E.3d 818 (Ind. 2025).  Users of TikTok "must agree to allow TikTok to access and collect the end-user's personal data" and TikTok "sells the collected personal data to advertisers, which make use of the end-user's data . . . to target solicitations within the app to those end-users."  Id. at 686.  The court had "little trouble concluding that Indiana's judiciary ha[d] specific jurisdiction over TikTok" in that case. Id. at 690.  As the court explained:

> Tiktok has millions of end-users of its app within Indiana.  Its engagement with those end-users is neither passive nor fleeting— TikTok uses the internet, to which its app is connected, to knowingly and repeatedly transmit data to and from each of those millions of Indiana end-users each and every hour of each and every day.
>
> Further, TikTok has purposefully availed itself of those Indiana contacts.  It has invoked those contacts as part of its business model —the exchange of access to TikTok's content library for end-user personal data, which TikTok collects and monetizes.

Id.  Accordingly, the court concluded that TikTok's contacts with Indiana were "well beyond the minimum needed to satisfy due process."  Id.

¶ 25.   Likewise, Instagram has tens of thousands of Vermont teen users with whom it enters into agreements and whose engagement with the app Meta tracks.  It purposefully avails itself of these contacts by invoking them "as part of its business model," id., to increase Vermont teen user engagement with the app to increase its advertising revenue from Vermont businesses. The fact that this business model may be applied across all States is irrelevant.

11

¶ 26.    More specifically, Meta purposefully availed itself of this forum by selling advertising to Vermont businesses targeting Vermont Instagram users, and Vermont teens specifically.  See UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 353 (4th Cir. 2020).  In UMG Recordings, Inc., the defendant, a Russian citizen, operated two websites that allowed users to illegally download copyrighted music.  The defendant designed and operated the website from Russia and had never been to the United States, or Virginia, the forum state.  The defendant's websites were free to use but they generated revenue by selling space to advertising brokers who leveraged the user-location data collected by the websites to display location-specific ads.  The Fourth Circuit held that the defendant's contacts with Virginia were sufficient to show that he "purposefully availed himself of the privilege of conducting business" there.  Id. at 354.  The court emphasized that the website had approximately 500,000 visitors from Virginia, and that the defendant engaged in commercial transactions with Virginia residents by the exchange of a service for the right to facilitate targeted ads.   "Far from being indifferent to geography," the court reasoned, "any advertising displayed on the [w]ebsites is directed toward specific jurisdictions like Virginia.  [The defendant] ultimately profits from visitors by selling directed advertising space and data collected to third-party brokers, thus purposefully availing himself of the privilege of conducting business within Virginia."  Id. at 353.  As such, the court concluded that the defendant could reasonably anticipate "being haled into court in Virginia."  Id. at 354.

¶ 27.    Instagram is also free to use.  And like the defendant in UMG Recordings, Inc., Meta purposefully avails itself of Vermont and can reasonably anticipate being haled into court in Vermont as it sells advertisements to Vermont businesses with the intention of targeting Vermont users.  And as a result, Meta profits from Vermont users.  "This is not a situation where [Meta] merely made [an application] that happens to be accessible in [Vermont]."  Id. at 354.

¶ 28.    Defendant cites Fidrych v. Marriott International, Inc., in which the Fourth Circuit found jurisdiction was lacking as to the defendant's "case related contacts" with the forum state.

12

952 F.3d 124, 143 (4th Cir. 2020). In that case, the plaintiff argued that such contacts existed because the hotel defendant's website included the forum state "as an option in the drop-down menu used by customers to select their state of residence when making reservations." Id. at 142. The court concluded however, that "the list of options confirm[ed] that the website was accessible to all but targeted at no one in particular." Id. at 143.

¶ 29. Mere accessibility of the online platform in a forum may be insufficient to support jurisdiction. See id. ("The general availability of the website to South Carolina residents thus does not create the substantial connection to South Carolina necessary to support the exercise of jurisdiction."). But here, the State is not relying solely on Instagram's accessibility in Vermont. Rather, as discussed above, Meta has purposefully availed itself of the Vermont market, including studying Vermont teen users to increase engagement with the application and engaging with Vermont businesses to sell targeted advertising space to target Vermonters. See Burger King Corp., 471 U.S. at 473 ("[A] forum legitimately may exercise personal jurisdiction over a nonresident who 'purposefully directs' [its] activities toward forum residents.").

¶ 30. Meta argues that its contacts with Vermont are solely due to Instagram users' unilateral decision to sign up for and use the application in Vermont. Certainly, "[t]he plaintiff cannot be the only link between the defendant and the forum" and our analysis must focus on the defendant's acts with the forum state. Walden, 571 U.S. at 285. "The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirements of contact with the forum State." Burger King Corp., 471 U.S. at 474 (quotation omitted). "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." Id. at 475 (emphasis omitted) (quotation omitted). But the mere fact that the users initiate a relationship between the defendant and themselves is not dispositive. As applicable here, the fact that Meta does not control the user's choice to sign-up and engage with the platform does not undermine Meta's deliberate

13

choice to directs its business at and solicit engagement from Vermont consumers and businesses. See NexLearn, LLC v. Allen Interactions, Inc., 859 F.3d 1371, 1379 (Fed. Cir. 2017) ("[Defendant] extinguished the unilateral nature of these contacts when it affirmatively responded to [plaintiff's] employees' requests by including them on its email subscription list and sending an email to these subscribers."); UMG Recordings, Inc., 963 F.3d at 355 ("[Defendant] directly profited from a substantial audience of Virginia visitors and cannot now disentangle himself from a web woven by him and forms the basis of [plaintiff's] claims.").

¶ 31.    Meta also points to Hasson v. FullStory, Inc., 114 F.4th 181 (3d Cir. 2024), and Johnson v. TheHuffingtonPost.com, 21 F.4th 314 (5th Cir. 2021).  In these cases, however, the minimum-contacts analyses that Meta relies on primarily apply the "effects" test.  See Hasson, 114 F.4th at 190-93 (affirming trail court dismissal for lack of personal jurisdiction in one case under effects test and noting no question of purposeful availment under traditional test, and remanding for analysis under traditional test for other case); Johnson, 21 F.4th at 318, 321-22 (rejecting plaintiff's assertion of jurisdiction because defendant's actions were not "aimed at" the forum state in particular).  "While the 'effects' test and the traditional test are cut from the same cloth, they have distinct requirements." Hasson, 114 F.4th at 189.  Courts have applied the "effects test" from Calder v. Jones, 465 U.S. 783 (1984), "to assess personal jurisdiction over an intentional tortfeasor whose contacts with the forum otherwise do not satisfy the requirements of due process under the traditional test." Hasson, 114 F.4th at 187 (alterations and quotation omitted).  Specifically, it requires "that the defendant expressly aimed his tortious conduct at the forum." Id.  But "[t]he effects test . . . does not supplant the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike." Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1357 (11th Cir. 2013).  Because we conclude that the State has shown purposeful availment, we need not consider the effects-test analysis separately.  See id.; City & Cnty of Honolulu v. Sunoco LP, 537 P.3d 1173, 1192 (Haw. 2023) ("Because [d]efendants are subject to specific

jurisdiction under the minimum contacts test . . . it is not necessary to engage in an effects test analysis as to the first two prongs of the due process inquiry."), cert denied, __ U.S. __, 145 S. Ct. 1111 (2025) (mem.). Further, the trial court did not apply the effects test, and neither party argues that the effects test applies to this case.

¶ 32. Separately, Meta argues that Vermont lacks specific jurisdiction over the State's misrepresentation claim because the alleged misrepresentations and omissions on which it is based "were not made in or directed at Vermont." This argument again confuses the requirements of the two tests. While specific statements used to show a defendant's contacts with the forum state must be aimed at the forum state and the forum state must be the focal point under the "effects test," the analysis under the traditional minimum-contacts test does not require each statement alleged by the forum state to be so directed. Therefore, here the State's evidence of Meta's deceptive and misleading acts was not required to be specifically aimed at or made in Vermont for jurisdiction to attach. For example, in Pinker v. Roche Holdings Ltd., the plaintiff brought a securities-fraud action against a foreign corporation alleging that he purchased American Depository Receipts (ADR)[4] "at a price that was artificially inflated due to the company's misrepresentations about the competitiveness of the vitamin market." 292 F.3d 361, 365 (3d Cir. 2002). In that case, the plaintiff's claim was based on the 1934 Securities Act, "a federal statute authorizing nationwide service of process." Id. at 369. As such, the court engaged in a "national contacts analysis." Id. (holding "federal court's personal jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process"). The court reasoned that the defendant's "sponsorship" of the ADR "amounted to an active marketing of its equity interests to American investors." Id. at 371.

---

[4] "An ADR is a receipt that is issued by a depositary bank that represents a specified amount of foreign security that has been deposited with a foreign branch or agent of the depositary." Pinker, 292 F.3d at 367. It "may be either sponsored or unsponsored" and when sponsored, the "issuer who sponsors an ADR enters into an agreement with the depositary bank and the ADR owners." Id.

15

The court explained that "[j]ust as solicitation of businesses in the forum state is generally sufficient to establish personal jurisdiction over the defendant for claims arising out of injuries to purchasers within the forum state . . . so too is personal jurisdiction appropriate where a foreign corporation has directly solicited investment from the American market." Id. (citation omitted). The court continued:

> Although the plaintiff's complaint does not allege that the fraudulent media releases and annual reports were specifically directed to American investors, a foreign corporation that has created an American market for its securities can fairly expect that that market will rely on reports and media releases issued by the corporation.

Id. at 372. Accordingly, the court concluded that the defendant "purposefully availed itself of the privilege of conducting activities in the American securities market" and thus "established the requisite minimum contacts with the United States." Id. at 371 (alteration and quotation omitted).

¶ 33. Similarly, Meta has purposefully availed itself of the Vermont social-media and advertising market and although the State's complaint does not allege that any misrepresentation or omission about the safety of the application was specifically aimed at Vermont users, or made in Vermont, Meta has created a Vermont market for its application and thus can fairly expect that the potential users of the application will rely on those representations in deciding whether to download and use it. See TikTok, Inc., 245 N.E.3d at 686, 691 (rejecting defendant's argument that defendant "neither engaged in its allegedly deceptive acts" including "a variety of misleading representations and omissions" in Indiana specifically "nor directed those alleged acts at Indiana in particular" because "[defendant] [wa]s neither passively operating a website (or its app) nor only occasionally doing business in Indiana via the internet" but rather, "[defendant's] contacts within Indiana [we]re substantial and continuous" (internal quotation marks omitted)).

¶ 34. The fact that the court in Pinker was considering whether a foreign defendant had sufficient contacts with the United States, rather than a particular state, does not diminish its relevance. Pinker, 292 F.3d at 369. The court concluded that "a federal court's personal

16

jurisdiction may be assessed on the basis of the defendant's national contacts when the plaintiff's claim rests on a federal statute authorizing nationwide service of process" and then proceeded to apply the traditional specific personal jurisdiction analysis under that standard. Id. at 369-70 (looking "at the extent to which the defendant availed himself of the privileges of American law and the extent to which he could reasonably anticipate being involved in litigation in the United States"). While the forum state for the analysis in that case was the United States rather than a particular state, the court's specific jurisdiction and minimum contacts analyses were the same. In other words, the court was not concerned that the specific misrepresentations were not particularly aimed at or made in the United States, just as we are not concerned that the particular statements were not made in Vermont or directly addressed to Vermont here.

¶ 35. None of the other cases Meta cites support a contrary conclusion. Again, these cases consider the requirements of personal jurisdiction with respect to defamation claims under the "effects test." See, e.g., Blessing v. Chandrasekhar, 988 F.3d 889, 905 (6th Cir. 2021) (holding social-media posting was not directed at forum and forum was not " 'the focal point' " (quoting Calder, 465 U.S. at 789)); Clemens v. McNamee, 615 F.3d 374, 379 (5th Cir. 2010) ("To support personal jurisdiction against the defaming defendant, this court has emphasized Calder's requirement that the forum be the focal point of the story." (quotation omitted)); Buelow v. Plaza Motors of Brooklyn, Inc., No. 2:16-cv-02592, 2017 WL 2813179, at *5 (E.D. Cal. June 29, 2017) ("At bottom, [defendant] did not expressly aim its misrepresentations at [forum state] so the Calder effects test is not satisfied."). As discussed above, the State has shown purposeful availment under the traditional minimum-contacts test and we do not engage in an effects-test analysis here.

B.

¶ 36. Having concluded that the complaint provides enough facts to demonstrate that Meta has sufficient minimum contacts with Vermont, we address whether the claims arise out of or relate to Meta's connections to Vermont. Meta argues that even if the State has established that

Meta has purposefully availed itself of Vermont, Vermont cannot assert personal jurisdiction over Meta in this case because the State's claims do not arise out of or relate to these contacts. We disagree.

¶ 37. "Specific jurisdiction is confined to adjudication of issues, deriving from, or connected with, the very controversy that establishes jurisdiction." Bristol-Myers Squibb Co. v. Super. Ct. of Cal., 582 U.S. 255, 262 (2017) (quotation omitted). "The plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." Ford Motor Co., 592 U.S. at 359 (quoting Bristol-Myers Squibb Co., 582 U.S. at 262). In other words, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or occurrence that takes place in the forum State and is therefore subject to the State's regulation.' " Id. at 359-60 (alteration in original) (quoting Bristol-Myers Squibb Co., 582 U.S. at 262).

¶ 38. Here, the State's claims are related to Meta's Vermont contacts. As the U.S. Supreme Court reiterated in Ford Motor Co., "specific jurisdiction attaches . . . when a company cultivates a market for a product in the forum State and the product malfunctions there." Id. at 352. Analogously, the State here asserts that Meta has cultivated and purposefully availed itself of the Vermont market for social media and that the use of Meta's product and subsequent misrepresentations about such use has caused injury to Vermonters.

¶ 39. Meta's argument that the U.S. Supreme Court's decision in Bristol-Myers Squibb Co. forecloses jurisdiction is inapposite. In Bristol-Meyers Squibb Co., the Court considered whether a California court could assert specific personal jurisdiction over an out-of-state defendant for claims brought by nonresidents of California. Specifically, a group of plaintiffs including both residents and nonresidents brought suit against a pharmaceutical company asserting several claims related to harm caused from Plavix, a prescription drug manufactured by the defendant. The defendant engaged in "business activities" in California including operating research and laboratory facilities, maintaining offices, and employing sales representatives. Bristol-Meyers

18

Squibb Co., 582 U.S. at 258-59. Plavix was not developed, manufactured, or packaged in California, but was sold there. "Between 2006 and 2012, [the defendant] sold almost 187 million Plavix pills in [California] and took in more than $900 million from those sales." Id. at 259. However, "[t]he nonresident plaintiffs did not allege that they obtained Plavix through California physicians or from any other California source; nor did they claim that they were injured by Plavix or were treated for their injuries in California." Id.

¶ 40. The California Supreme Court held that California could assert personal jurisdiction over the defendant for the nonresident plaintiffs' claims applying "a sliding scale approach." Id. at 260 (quotation omitted). Under this approach, "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim." Id. (quotation omitted). The U.S. Supreme Court rejected this approach, however, and held that "a defendant's general connections with the forum are not enough." Id. at 264. More specifically, the Court reasoned that the nonresident plaintiffs did not suffer harm in California, and "all the conduct giving rise to the nonresidents' claims occurred elsewhere." Id. at 265. As such, "[a] corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.' " Id. at 264 (alterations in original) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 927 (2011)).

¶ 41. Unlike the nonresident plaintiffs in Bristol-Meyers Squibb Co., the State here alleges Vermont teens accessed Instagram in Vermont, suffered consequences in Vermont, and became addicted to Instagram in Vermont and that Meta's unfair practices and misrepresentations contributed to this harm in Vermont. See id. at 268 (suggesting nonresident plaintiffs "could probably sue together in their respective home States"); Ford Motor Co., 592 U.S. at 370 (distinguishing Bristol Meyers Squibb Co. and recognizing "an activity or an occurrence that took

19

place" in the forum state created an "affiliation between the forum and the underlying controversy" which, in turn, made the plaintiffs' home states "the most natural [fora]" (quotation omitted)).

¶ 42. Meta also argues that the State's claims are not related to its contacts with Vermont because the State is not claiming that viewing advertisements is causing Vermonters to be addicted to Instagram, that the State is not challenging the contracts themselves in any way, or arguing that Meta's study of Vermont users led to a change in the design of Instagram. However, the relatedness requirement does not demand such a strict causal showing. Ford Motor Co., 592 U.S. at 361 ("[Defendant's] causation-only approach finds no support in [the U.S. Supreme Court's] requirement of a 'connection' between a plaintiff's suit and a defendant's activities."); see also id. at 370 (rejecting defendant's assertion of no jurisdiction where cars involved in products-liability case had not been sold, designed, or manufactured in forum states because "residents of the forum States . . . used the allegedly defective products in the forum States . . .[a]nd they suffered injuries when those products malfunctioned in those forum States"). While there may not be a direct causal relationship between the contracts, advertisements, or the study and the State's claim, the State is claiming that Meta is encouraged to design Instagram in a way to increase Vermont user engagement to increase advertisement revenue. And it does that by requiring users to accept the transfer of their personal information to freely use Instagram. In other words, the State is challenging the very business model that Meta has directed at Vermont because, the State argues, that business model has led to the alleged injuries suffered by Vermonters. Thus, there is a sufficient relationship between the State's claims and Meta's connections to Vermont.

¶ 43. Meta's reliance on Johnson for the relatedness requirement is similarly misguided. In Johnson, the Fifth Circuit held that a website's use of targeted ads in the forum state did not relate to the plaintiff's libel claim. 21 F.4th at 321. The court concluded that the plaintiff did not claim that the alleged libel was aimed at the forum state through targeted ads but instead the visits to the defendant's websites reflected "the unilateral activity of persons in" the forum state. Id.

20

(quotation and citation omitted). The court also rejected the argument that the ads were how the defendant made money. Notably, the court emphasized that the plaintiff "chose to plead a libel claim." Id. The court continued by noting that "[t]he harm of libel is the reputational injury that results from the defendant's purposefully sharing that libel with others. It does not turn on whether the defendant's unrelated activities make or lose money." Id. (citation omitted). Most relevant, the court reasoned that "[t]hird party ads on [the defendant's] site . . . neither caused nor relate to the harm that the story caused." Id. Here, however, the State did not choose to plead a libel claim. Instead, as discussed above, the very nature of its claim is challenging how Meta makes money and how that business model and resulting application design harms Vermont teen users of Instagram. As such, these contacts relate to the State's claims.

¶ 44.    Similarly, Hasson does not support Meta's position. In that case, the plaintiff sued a company that operated the website that "deployed" code on its browser that collected a variety of personal information of users visiting the site. Id. at 187-88 (emphasis omitted).[5]    After concluding that the plaintiff "failed to plead facts sufficient to render [the defendant] amenable to personal jurisdiction in [the forum state] under the Calder effects test," as noted above, the Third Circuit also concluded that jurisdiction was likewise improper under the traditional test. 114 F.4th at 192, 195. First, the court concluded that "[t]here was no doubt that [the defendant] purposefully availed itself of the [forum state] market" as the defendant "maintains approximately 85 brick-and-mortar locations" in the forum state "and regularly markets and advertises its goods and services" within the forum state. Id. at 193. However, the court concluded that the complaint failed at the second step of the analysis, although noting it was "a close call." Id. The court

---

[5] In Hasson, two cases were joined in the appeal. The first case was a class action against one defendant on claims of wiretapping and invasion of privacy for producing the code on a website. The second case, the one we address here, was brought by a different plaintiff against a company who used that same code on its website. As noted above, the Third Circuit only addressed the effects test in the first case and thus we do not consider its analysis as to that case here.

21

concluded that the company defendant's "in-state restaurant sales and marketing activities" were "insufficiently related to [the plaintiff's] wiretapping claims." Id. at 195. The Third Circuit reasoned that "although [the plaintiff] alleged [the defendant] heavily markets its online ordering platform in order to drive customers to its website, which is a central focus point of its business model, [the plaintiff] did not allege any facts regarding the company's promotion of its website in [the forum state]." Id. at 194. Ultimately, the court was most concerned that the plaintiff failed to "offer facts regarding [the defendant's] efforts to specifically direct or connect [the forum state's residents] to the alleged harm." Id.

¶ 45. The Third Circuit in Hasson did not reject the business-model approach as Meta suggests. The primary difference here is that the State has offered facts regarding Meta's efforts to "specifically direct or connect [Vermonters] to the alleged harm." Id. The State alleges that Meta's connections to Vermont are through the very application that has caused the alleged harm to Vermonters, unlike in Hasson, in which the physical stores in the forum state and the targeted advertisements were not connected to the plaintiff's alleged harm from using the website. Id. at 195.

C.

¶ 46. Having established that Meta has minimum contacts with Vermont and those contacts relate to this cause of action, "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." Atl. Richfield Co., 2016 VT 22, ¶ 27 (quotation omitted). These factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King Corp., 471 U.S. at 477. But "where a defendant who purposefully has directed his activities at forum residents

seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. On appeal, Meta's only argument that asserting jurisdiction over it in this case would be unreasonable is that it "would blur the distinction between general and specific jurisdiction, subjecting Meta to personal jurisdiction in every forum in the country."

¶ 47. As Meta rightly insists, the holdings in Bristol-Meyers Squibb Co. and Ford Motor Co. impose "real limits" on the level of connection between claims and activities sufficient to support specific jurisdiction. Ford Motor Co., 592 U.S. at 362. As the Court in Ford recognized, "[o]ne State's sovereign power to try a suit . . . may prevent sister States from exercising their like authority." 592 U.S. at 360 (quotation omitted). "The law of specific jurisdiction thus seeks to ensure that States with little legitimate interest in a suit do not encroach on States more affected by the controversy." Id. (quotation omitted). These cases may prevent, for example, New Hampshire plaintiffs from bringing suit against Meta in Vermont for their alleged harm caused by their use of Instagram in New Hampshire. But here, where the State is suing Meta for its unfair design and misrepresentation of an application that was made available, downloaded, and used in Vermont by tens of thousands of Vermont teens on a daily basis in exchange for their personal information, and as a result generated revenue for Meta and caused harm to Vermont teens, the due-process concerns addressed by Ford and Bristol-Meyers Squibb Co. are clearly extinguished.

III.

¶ 48. A company that reaches out and purposefully avails itself of a forum state's market for its own economic gain can expect to be haled into court in that jurisdiction to account for its conduct related to those business activities. Surely, that company cannot avoid jurisdiction in one state just because it avails itself of another, or many others, in the same way. The State has undoubtedly met its burden of demonstrating sufficient facts to support jurisdiction in this case.

¶ 49.    In sum, the civil division did not err in concluding that the allegations in the State's complaint support a prima facie case for specific jurisdiction over Meta in Vermont.  Accordingly, we affirm the court's decision to deny Meta's motion to dismiss for lack of personal jurisdiction.

Affirmed.

FOR THE COURT:

_____

Associate Justice