Vermont Superior Court
Filed 05/27/26
Washington Unit



VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 24-CV-03984

**State of Vermont v. TikTok Inc.**

## ENTRY REGARDING MOTION

Title: Motion to Dismiss MOTION UNDER ADVISEMENT AS OF 1/20/26 (Motion: 7)
Filer: Tristram J. Coffin
Filed Date: December 09, 2024

The motion is DENIED.

In this case, Plaintiff the State of Vermont asserts that Defendant TikTok, Inc., which operates a popular social media platform, has violated Vermont's Consumer Protection Act (CPA), 9 V.S.A. §§ 2451–2494z, in 3 counts: "by engaging in unfair and deceptive acts and practices in commerce, including by [Count 1] designing its social media application with features that contribute to and cause compulsive and excessive use, harming the mental and physical health of all users and especially children; [Count 2] operating an unlicensed money transmitter system through its TikTok LIVE feature which financially and sexually exploits children; and [Count 3] making materially misleading statements and omissions, including about the safety of its application and its profit from in-App transactions." Complaint at 1 (filed Oct. 8, 2024).

On December 9, 2024, TikTok filed both a motion to dismiss this case for lack of personal jurisdiction (and other reasons) and a motion to stay this case pending a decision in *State v. Meta Platforms, Inc.*, No. 24-AP-295, in which the Vermont Supreme Court was considering, on interlocutory review, the superior court's personal jurisdiction over Meta (operator of social media website Instagram) in a case with similar CPA claims advanced by the State. In support of a stay, TikTok "argue[d] that the personal jurisdiction issue in the *Meta* appeal is fundamentally similar to the one here, and a stay would serve the interest in judicial economy." *State v. TikTok Inc.*, No. 24-CV-03984, 2025 WL 1862599, at *2 (Vt. Super. Ct. Mar. 25, 2025). The court granted the stay, explaining that "one can reasonably expect that the

1

Vermont Supreme Court's decision in the *Meta* appeal is highly likely, one way or another, to establish critical guideposts that the Court will follow in this case." *Id*. at *3. By the time the court stayed the case (March 25, 2025), the State had filed its opposition to dismissal, and TikTok had filed its reply. The Supreme Court's decision in *Meta*, concluding that jurisdiction over Meta in Vermont complied with due process, was issued on August 29, 2025, lifting the stay in this case. *State v. Meta Platforms, Inc.*, 2025 VT 51. On September 22, 2025, TikTok sought leave to file a supplemental brief addressing the *Meta* decision. The court granted the motion and permitted the State to also file a supplement. See V.R.C.P. 7(b)(4) (court may allow a surreply memorandum if it "would assist in clarifying the issues").[1] With the stay lifted, briefing complete, and following oral argument, the court now resolves TikTok's motion to dismiss.

TikTok seeks Rule 12(b)(2) dismissal, arguing that the court lacks both general and specific personal jurisdiction over it in Vermont. It also seeks Rule 12(b)(6) dismissal for failure to state a claim, arguing: (1) the underlying conduct at issue in this case is fully immunized by Section 230 of the Communications Decency Act, 47 U.S.C. § 230; (2) the State's claims are barred by TikTok's free speech rights under the First Amendment to the U.S. Constitution; and (3) the CPA claims necessarily fail on the merits because there is no "commerce" at issue, there is nothing alleged to be "unfair" for CPA purposes, and there are no identified "deceptive" practices pleaded with particularity under Rule 9(b) beyond mere puffery or aspirational statements. The State opposes dismissal on any basis.

---

[1] Apart from the principal dismissal filings and the two supplements permitted by the court's September 24, 2025, order, the court's March25, 2025order imposing a stay had little influence on either TikTok or the State. Without seeking permission from the court once, the parties filed unauthorized surreplies on February 21, 2025; February 25, 2025; June 24, 2025; June 25, 2025; July 1, 2025; July 15, 2025; July 18, 2025; September 3, 2025; September 29, 2025; October 13, 2025; January 14, 2026; January 16, 2026; January 27, 2026; January 28, 2026; February 23, 2026; February 24, 2026; April 6, 2026; and April 7, 2026. The court disregards these filings for purposes of TikTok's dismissal motion for lack of compliance with V.R.C.P. 7(b)(4). While the parties indicated that most such filings were intended to bring new case citations to the court's attention, the filings are replete with argument. There is no open-ended analog in the civil rules to appellate Rule 28(h), which pre-authorizes parties to indicate via letter "supplemental citations" arising after briefing otherwise is complete. And even Rule 28(h) requires that such letters must be "without argument." They are not an invitation to endless briefing. While the Court has reviewed these supplemental filings, the Court would appreciate more conscientious compliance with the civil rules, particularly Rule 7, in the future from both parties.

2

1.    _Personal jurisdiction_

TikTok argues that both specific and general personal jurisdiction are lacking in this case. The difference between these two concepts has been described as follows:

> Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum"; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts. Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's "continuous and systematic general business contacts."

_Metropolitan Life Ins. Co. v. Robertson-Ceco Corp_., 84 F.3d 560, 567-68 (2d Cir. 1996) (citations omitted); see also _Canaday v. Anthem Companies, Inc_., 9 F.4th 392, 400 (6th Cir. 2021) (the contacts relevant to specific personal jurisdiction are claim-specific).

The State concedes that there is no basis for general jurisdiction over TikTok. Instead, it argues for specific jurisdiction. In determining specific personal jurisdiction, the Vermont Supreme Court has explained that:

> Vermont's long-arm statute, 12 V.S.A. § 855, confers jurisdiction to the full extent allowed by the United States Constitution. Our inquiry focuses on whether the defendant has sufficient contacts with Vermont that maintaining the lawsuit here does not "offend traditional notions of fair play and substantial justice." The central question in determining whether specific jurisdiction may be exercised is whether the defendant has purposefully availed itself of the privilege of acting in the forum state. This requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." Put another way, the purposeful-availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'"

_N. Sec. Ins. Co. v. Mitec Elecs., Ltd_., 2008 VT 96, ¶ 14, 184 Vt. 303 (citation omitted).

Procedurally, the plaintiff must establish the basis for jurisdiction. That may be affirmatively established at an evidentiary hearing or on a prima facie basis if on pleadings and

affidavits alone.  See *Schwartz v. Frankenhoff*, 169 Vt. 287, 295 (1999) (citing *Godino v. Cleanthes*, 163 Vt. 237, 239 (1995)).  As the Vermont Supreme Court has recently explained:

> If . . . a court chooses to rule on a motion to dismiss for lack of personal jurisdiction on the basis of affidavits alone, the party opposing [the] motion need make only a prima facie showing of jurisdiction, or, in other words, demonstrate facts which would support a finding of jurisdiction.  The nonmoving party's prima facie showing must go beyond the pleadings and rely upon specific facts set forth in the record.  In assessing the submitted materials, the [trial] court eschews fact finding and simply accepts properly supported proffers of evidence as true and rules on the jurisdictional question as a matter of law."

*State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 9, 201 Vt. 342 (citing *Godino*, 163 Vt. at 239; *Schwartz*, 169 Vt. at 295) (internal quotations and citations omitted); see also *N. Sec. Ins. Co.*, 2008 VT 96, ¶ 15 ("[W]here no evidentiary hearing is held on the jurisdictional issue, 'the Court must consider the pleadings and affidavits in a light most favorable to the plaintiff.'" (citation omitted)).

There has been no evidentiary hearing on personal jurisdiction.  The question is whether the State has affirmatively demonstrated a prima facie showing of specific personal jurisdiction.

TikTok operates a popular social media website (the platform) that allows users to create, share, and comment on videos.  It has thousands of users who are Vermont residents, each of whom contracted with TikTok for cost-free access to the platform in exchange for giving TikTok broad access to their personal data.  TikTok then sells that data, including the location of its users, to marketers, who use it to target their advertisements on the platform to Vermont users.  TikTok also earns commissions on Vermont users' "In-App Purchases" and the sale of its virtual currency.  Many Vermont users create content for TikTok.  TikTok's algorithm tailors the content it continuously provides to each Vermont user based on the extensive data it collects.[2]

According to the State, the claims all arise directly out of these contacts.  Under Count 1, the State asserts that TikTok has intentionally designed its platform to result in "compulsive and

---

[2] As discussed at oral argument, this is both TikTok's primary feature and the source of much of the public consternation over the platform.  TikTok has developed a platform that feeds users an endless stream of short content videos that are tailored to hold their interest, effectively keeping their attention for extended periods as users scroll from one video to the next, directed only by the programing algorithm's curation.  This curation, in turn, relies upon the algorithm knowing the user's information, likes, and profile.  Rather than passive curation, the TikTok experience relies on the on-going feedback loop/predictive analysis to create the experience.  This is significantly different than other, more passive user platforms and shares the data-driven user-focused approach that entities like Instagram share to capture the attention and focus of users for extended periods of time.

4

excessive" use because the longer a user interacts with it, the greater the profits that flow to TikTok. Count 2 focuses on the financial incentives (and repercussions) related to "TikTok LIVE," a service within the TikTok platform, which has engaged multiple Vermont users. And Count 3 focuses on alleged misrepresentations that TikTok has made about the safety and design of its platform.

In short, TikTok intentionally does substantial business in Vermont, and the claims in this case arise directly out of that commercial activity. There is nothing unfair about haling TikTok into court in Vermont to respond to those claims.

In TikTok's view, it directs no contacts to Vermont whatsoever. It merely operates a free website that anyone can access. TikTok contends that whatever harm is alleged is entirely irrelevant to the location of its users. Such alleged harm is the same no matter where the particular user is located. In other words, the harm that the State describes is simply a feature of their platform and users come to it, and it has nothing to do with TikTok directing any contacts into Vermont. These alleged contacts "are not targeted at Vermont users, but are merely incidental to providing a globally accessible platform." TikTok's Reply at 8 (filed Feb. 7, 2025).

The Supreme Court's decision in *Meta*, 2025 VT 51, looms large over this case. TikTok found the issues in that case "substantially similar" to this case when seeking a stay. TikTok's Motion to Stay at 3 (filed Dec. 9, 2024) ("Principles of judicial economy favor staying proceedings so that the Court may benefit from the insights of the Vermont Supreme Court on substantially similar issues presented in the *Meta* appeal."). Now it finds the cases fundamentally distinguishable. See TikTok's Supplemental Brief (filed Sept. 22, 2025).

*Meta* presented a novel case of first impression in Vermont as far as its factual setting goes: personal jurisdiction over an operator of a social media website accessible nationwide. Notwithstanding the electronic ink that the parties have spilled over this decision, the most interesting aspect of *Meta* is the extent to which it reflects that the basic principles of traditional, personal-jurisdiction jurisprudence are fully sufficient to arrive at a sensible result in digital settings without needing to break any new ground. So it is with the present case.

In *Meta*, the State had alleged that "Meta intentionally designed Instagram to be addictive to teens, that Meta did so to increase advertisement revenue, despite knowing the resulting negative effects on teens. The State alleged that Meta failed to take meaningful action to mitigate these harms while both actively minimizing and withholding its relevant internal

5

research findings to maintain teens' engagement with the application." *Meta*, 2025 VT 51, ¶ 3. For jurisdictional purposes, those claims and allegations are very similar claims to Counts 1 and 3 here. The Court found that Meta continuously and deliberately exploited the Vermont market by operating a "nationwide social-media application used by a nationwide audience, including Vermont," which has thousands of Vermont users, with which it contracts, and uses their personal data so advertisers can target them, and it can profit. *Id*. ¶¶ 20, 22. "The fact that this business model may be applied across all states is irrelevant." *Id*. ¶ 25. Nor does it matter that specific, alleged misrepresentations may not have been specifically "aimed at Vermont users" because it "can fairly expect that the potential users of the application will rely on those representations." *Id*. ¶ 33. The claims in Meta all arose out of Meta's contacts with Vermont insofar as the State was "challenging how Meta makes money and how that business model and resulting application design harms Vermont teen users of Instagram." *Id*. ¶ 43. It thus turned to whether Meta had come forward with any "compelling case" of other considerations demonstrating that jurisdiction in Vermont would be unreasonable.[3] *Id*. ¶ 46. It had not. The Court thus concluded that personal jurisdiction over Meta complied with due process.

TikTok now argues that *Meta* is entirely distinguishable from the circumstances of this case. The crucial differences, it argues, are that Meta studied its Vermont users in particular, and Meta sold advertising space to Vermont businesses, and those businesses were named in the complaint. TikTok does not refute the suggestion that it sells advertising space to Vermont businesses, but it notes the lack of such an allegation in the complaint. These circumstances, TikTok argues, are the "lynchpin" of the *Meta* decision.

*Meta* is entirely on point and controls the outcome here. The distinctions that TikTok draws reflect that the circumstances of *Meta* are not identical to those of this case. But they do not support the further argument that these distinctions are critical or some kind of lynchpin without which personal jurisdiction would not have been found in *Meta* and should not be found here. Directing substantial contacts into Vermont is a substantial contact even if a business has not conducted Vermont-specific research to improve its skill at doing so. And while the sale of advertising space to Vermont businesses is not detailed in the complaint in this case, the sale of advertising space to businesses wishing to target Vermont users for advertising purposes is. The

---

[3] TikTok does not even attempt such a showing here.

claims in this case arise out of the alleged harm to TikTok users, not TikTok advertisers. The circumstances of *Meta* that TikTok emphasizes here were worth pointing out there, but the thrust of the specific personal jurisdiction analysis by no means depends on them.

In this respect, the Court understands the importance of *Meta* to rest, not on a reinvention of meaningful contacts into a checklist for the digital age. Rather *Meta* represents the application of traditional personal jurisdiction concepts in an age where a digital defendant is unlikely to physically plant their footprint in the state as International Shoe might have in the analog era. See *International Shoe Co. v. Washington*, 326 U.S. 310, 313–14, 317–20 (1945) (finding a company's on-going sales of shoes to Washington States residents and use of in-state salesforce created sufficient contacts with the state). The holding of *Meta* recognizes that digital actors do not physically reach into the various states, through mail, office space, or even agents who work or reside in the forum. Because the nature of business and commerce have changed, so has the manner of contact. Rather than sending a box of shoes physically to the customer, TikTok, Meta, and other social media companies push digital messages, and create contact with forums through the computer, the smart phone, and other digital devices. *Meta*, 2025 VT 51, at ¶¶ 30, 31. There is no ambiguity or passivity about these activities as the State has alleged TikTok, like Meta, is regularly reaching into Vermont, promoting and interacting with Vermont users, and utilizing these users' personal information and location to generate targeted marketing and business opportunities that constitute the platform's business.[4]

Similarly, the fact that Count 2 in this case does not have a direct analog with the *Meta* case does not affect the outcome. The allegations related to Count 2 reflect yet more engagement and commercial activity that TikTok has with Vermont users. These allegations only support the extension of personal jurisdiction over TikTok rather than undermine it.

---

[4] In part, the State's complaint focuses on the fact that TikTok, like many social media companies, ultimately derives its income from targeted advertising revenue, which is, in turn based on its ability to identify and hold the widest audience possible. See *S. Patel*, *Are Streaming Services the Modern-Day Insiders?*, 17 RUTGERS BUS. L. REV. 61, 61 (2021) ("There is a common saying if you are not paying for the product, then you are the product."). In this respect, the Court understands the State's claims and the personal jurisdiction analysis to center, not on the concept of TikTok as a short form video streaming service, but on the alleged business model that TikTok and other social media companies have created around building, identifying, and holding an audience whose attention or information can be sold to advertisers focused on reaching particular markets. In this respect, TikTok and other similarly situated companies are merely digital inheritors of mid-century advertising efforts that began to plumb the depths of consumer responses to various products on a deeper psychological level. See VANCE PACKARD, THE HIDDEN PERSUADERS 19–31 (1957) (detailing research conducted into identifying subconscious and other persuasive triggers for advertisers to effectively connect consumers with products).

For these reasons, the State has established a prima facie showing of personal jurisdiction over TikTok.  TikTok's motion to dismiss is, therefore, **Denied**.

2.      *Remaining arguments other than Rule 9(b) particularity*

TikTok also seeks dismissal for failure to state a claim under Rule 12(b)(6) because: (1) the underlying conduct at issue in this case is fully immunized by Section 230 of the Communications Decency Act, 47 U.S.C. § 230; (2) the State's claims are barred by TikTok's free speech rights under the First Amendment to the U.S. Constitution; and (3) the CPA claims necessarily fail on the merits because there is no "commerce" at issue, there is nothing alleged to be "unfair" for CPA purposes, and there are no identified "deceptive" practices beyond mere puffery or aspirational statements.  In other words, in TikTok's view, the State's claims all eventually will fail.

A motion to dismiss for failure to state a claim faces a high bar.  The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> "A motion to dismiss . . . is not favored and rarely granted."  This is especially true "when the asserted theory of liability is novel or extreme," as such cases "should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations."  In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, "'it appears beyond doubt' that there exist no facts or circumstances that would entitle the plaintiff to relief."  We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309 (citations omitted); see also 5B A. BENJAMIN SPENCER, ET AL., FED. PRAC. & PROC. CIV. § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists.").

The court declines, under Rule 12(b)(6), to resolve the disputed merits of the State's claims.  "Vermont has 'extremely liberal' notice-pleading standards.  '[T]he threshold a plaintiff must cross in order to meet our notice-pleading standard is 'exceedingly low.'  A complaint need only be 'a bare bones statement that merely provides the defendant with notice of the claims against it,' for its 'purpose is to initiate the cause of action, not prove the merits of the plaintiff's

case.'" *Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co.*, 2022 VT 45, ¶ 40, 217 Vt. 195 (citations omitted).

TikTok does not lack fair notice of the State's claims, the allegations are sufficient to initiate this cause of action, and the complaint otherwise is not clear on its face that the asserted claims necessarily must fail once the evidence is developed. That some or all the claims may eventually fail on the merits is insufficient. Rule 12(b)(6) is not designed "to force a merits determination in the early stages of litigation." *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 14, 184 Vt. 1. It is to test whether judgment or relief is possible under facts or circumstances reasonably derived from the complaint in a light most favorable to the State. *Alger*, 2006 VT 115, ¶ 12.

In this respect, each of TikTok's affirmative defenses are ultimately fact-specific claims.

As noted above, the State has focused its efforts on the commercial portions of TikTok's business model (creating, identifying, holding, and then selling access to its audience and its information). If proven, this would be sufficient to establish that TikTok's actions fall under the definition of "commerce." 9 V.S.A. § 2453; see also *Carter v. Gugliuzzi*, 168 Vt. 48, 52 (1998).

It also takes the analysis out of the protective shield of Section 230. As other Vermont Courts have noted, Section 230 is intended to protect internet service providers and web hosts from liability resulting from information created and developed by third parties. *State of Vermont v. Clearview AI, Inc.*, Dckt. No. 226-3-20 Cncv, 2020 WL 14102154, at *3 (Sept. 10, 2020) (Toor, J.) (citing *Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010)). The State's claims in this case have nothing to do with the actual videos and content that TikTok hosts. See *Fed. Trade Comm'n v. LeadClickMedia, LLC*, 838 F.3d 158, 173 (2d Cir. 2016) (noting that one element of a Section 230 defense is to show that the "claim is based on information provided by another information content provider"). Instead, the State's claim centers on the nature of TikTok's proprietary platform and curating algorithm that makes TikTok tick.[5]

---

[5] In this respect, there is a fundamental question that will have to be developed in the facts concerning the actual impact of TikTok's platform vis-à-vis the precise nature of the harm alleged. The State's argument, as the Court understands it, is similar to its other cases involving advanced-thinking computer technologies, namely that these systems take otherwise innocuous materials and weaponize it through proprietary systems into something more harmful or nefarious to the general public, and children, in particular. See *State of Vermont v. Clearview AI, Inc.*, Dckt No. 25-CV-1789, 2025 WL 3700359, at *1 (Dec. 15, 2025) (Richardson, J.) (describing the State's claims against an AI company that culls publicly available data to develop a biometric database to identify individuals). Yet, this proposition is far from self-evident and is remarkably similar in character to what the Canadian philosopher Marshall McLuhan described at the end of his study on the impact that the invention of the printing press had on western culture. McLuhan writes:

In this respect, the issue of the First Amendment will also have to be deferred until more of a factual record is developed. The central issue is whether the platform can be separated from the content. The State's claim does not contend that TikTok should be prohibited from posting or re-posting content, but it is contending that the platform and model designed to feed viewers content is, in and of itself, subject to liability for the harm it causes. The question for the parties, and ultimately the Court, will be to determine if these platforms and frameworks can be separated out from the content displayed—can the medium be distinct from the message?

Put another way, if a speaker stands on a corner and uses a megaphone to broadcast a particular, wordless tone that anyone listening for more than 5 minutes will likely suffer hearing loss, then such actions would not be protected by the First Amendment. *Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment." (internal citations omitted)). If, however, a study showed that listening to an uninformed speaker opine about issues for more than 30 minutes led to cognitive decline, any effort to limit the "health impact" of such speech would run directly into the First Amendment. *State v. Tracy*, 2015 VT 111, ¶ 16 ("Equally fundamental is the principle that 'the Constitution protects expression ... without regard ... to the truth, popularity, or social utility of the ideas and beliefs which are offered.'") (quoting *NAACP v. Button*, 371 U.S. 415, 444–45 (1963)).

In this case, the State has premised its claims on TikTok's undercarriage—its platform and code that dictate the user experience and which are allegedly tweaked to maximize engagement, regardless of the content. For the purposes of a motion to dismiss, the Court concludes that this claim does not necessarily or facially invoke First Amendment protections to the extent that it would mandate dismissal at this stage. *Alger*, 2006 VT 115, at ¶ 12 (noting that

---

Even without collision, such co-existence of technologies and awareness brings trauma and tension to every living person. Our most ordinary and conventional attitudes seem suddenly twisted into gargoyles and grotesques. Familiar institutions and associations seem at times menacing and malignant. These multiple transformations, which are the normal consequence of introducing new media into any society . . . .

MARSHALL MCLUHAN, THE GUTENBERG GALAXY: THE MAKING OF TYPOGRAPHIC MAN 278–79 (1962). McLuhan and others note that these technological shifts bring uncertainty until the society begins to reframe and adapt to the change. In McLuhan's later work, he coined the phrase "the medium is the message" to denote the fact that technologies, more than content, shape what we communicate. MARSHALL MCLUHAN, UNDERSTANDING MEDIA: THE EXTENSIONS OF MAN 23–24 (2d ed. 1964). In this vein, any new technology can appear threatening and scary because the listener is considering the message through the lens of an older or different technology. *Id*. at 68–77.

motions to dismiss are "not favored and rarely granted" particularly when "the theory of liability is novel or extreme" and "should be explored in the light of facts as developed by the evidence"). Yet, the State will have to demonstrate going forward that its allegations can be separated from the content in such a way that the Court's review of TikTok commercial activity can be distinguished from the rapid-fire, short video speech content that it broadcasts.

For these reasons, TikTok's motion is **denied** as to these matters.

### 3. *Rule 9(b) particularity*

TikTok argues, in part, that any CPA claims based on deception should be dismissed because the State has not pleaded any such deceptive statements or practices with particularity as required by Rule 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The State argues that Rule 9(b) does not apply to claims under the CPA, let alone CPA claims brought by the State, and the claims satisfy that standard in any event. Assuming without deciding that Rule 9(b) applies to CPA claims, the court declines to dismiss them based on TikTok's perceived lack of particularity.

Rule 9(b) is a pleading standard—it is not a rule of dismissal:

> Courts infrequently dismiss for a failure to plead with sufficient particularity under Rule 9(b), at least not without providing an opportunity to replead. To impose such a drastic sanction for a pleading defect arguably is at odds with the liberal approach the federal rules as a whole take to the pleading phase of litigation and could lead to injustice.

5A A. BENJAMIN SPENCER, ET AL., FED. PRAC. & PROC. CIV. § 1296 (4th ed.) (footnotes omitted); see also *id*. ("Consequently, Rule 9(b) motions often yield no more than litigation delays or slightly amended complaints.").

In this case, TikTok only seeks dismissal. It does not request an order requiring amendment. Nor does it claim to not understand the allegations, that the State has some improper motive in bringing the claims, or that the claims are "lightly made" and unserious. *Id*. ("Rule 9(b) is necessary to safeguard potential defendants from lightly made claims charging the commission of acts that involve some degree of moral turpitude. The notion is that a heightened pleading requirement imparts a note of seriousness and encourages a greater degree of pre-institution investigation by the plaintiff.").

11

It is not clear how much more particularity TikTok could want in any event—the complaint is already 89 pages long. See V.R.C.P. 8(a), (b) (indicating that the pleadings are supposed to be "short and plain"). However, if it truly believes that more particular pleading is necessary, it may request an order requiring such amendment on a showing that the complaint violates the laudable spirit of Rule 9(b).

Short of such a request, the Court finds that TikTok's motion does not support dismissal as particularity is not a basis for dismissal. Defendant's motion is **denied** on this point as well.

### ORDER

For the foregoing reasons, TikTok's motion to dismiss is **Denied**. TikTok shall have 21 days from the issuance of this Order to file an answer to the State of Vermont's complaint.

Electronically signed on 5/27/2026 11:43 AM pursuant to V.R.E.F. 9(d)

Daniel P. Richardson
Superior Court Judge

12